Sennayi TEOUME–LESSANE, Appellant

v.

UNITED STATES, Appellee.

No. 04–CF–904.

District of Columbia Court of Appeals.

Argued Sept. 27, 2006.
Decided Sept. 6, 2007.

Barry Coburn, Washington, DC, for appellant.

Florence Pan, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Roy W. McLeese III and Gregory G. Marshall, Assistant United States Attorneys, were on the brief for appellee.

Before FARRELL and KRAMER, Associate Judges, and NEBEKER, Senior Judge.

KRAMER, Associate Judge:

This appeal is from the second of two trials arising from the same set of facts.[1] Following a hung jury at the conclusion of the first trial, the government sought a superceding indictment that charged appellant, Sennayi Teoume–Lessane (hereinafter, Lessane), with First-degree Child Sexual Abuse (vaginal penetration) and First-degree Child Sexual Abuse (anal penetration). The jury found him guilty of First-degree Child Sexual Abuse by vaginal penetration, but acquitted him of the anal penetration count. Lessane was subsequently sentenced to six years of incarceration, to be followed by a five-year period of supervised release with the conditions that he register as a lifetime sex offender and undergo sex offender treatment.

Lessane now raises several allegations of error. First, he argues that his conviction must be reversed because, contrary to provisions of the Innocence Protection Act of 2001 codified in D.C.Code § 22–4132 (2006 Supp.), the trial court failed to inform him before trial and on the record of his rights with respect to independent testing of the government's biological evidence. He also asserts that reversal is required because the addition of a new

charge to the superceding indictment on retrial—*i.e.,* First-degree Child Sexual Abuse (anal penetration)—triggers an unrebutted presumption of prosecutorial vindictiveness. Finally, Lessane alleges several instances of prosecutorial misconduct, including impermissible burden-shifting and prejudicial comments made by the prosecutor during summation. Finding no reversible error, we affirm.

## I.

### A. The Uncontested Facts

Evidence adduced by the parties at trial established the following sequence of events. On January 14, 2002, the complaining witness, J.P., then 14 years of age and a resident of Fairfax County, Virginia, took a dose of a friend's Aderall (a prescription amphetamine variant) while at school. She then left school early without permission and went to a friend's house in Fairfax County, where she spent the remainder of the afternoon using intoxicants, including alcohol and marijuana, that caused her to hallucinate. Later that day, J.P. was told that her parents were looking for her, and she became worried that she would get in trouble if her parents found out about the day's events.[2] Thus, she left her friend's house and made her way to the District of Columbia, where she and appellant Lessane, then age 32, shared drinks and conversation at a Georgetown

---

1. The original indictment against the appellant charged him with one count of First-degree Sexual Abuse (vaginal penetration), in violation of D.C.Code § 22–3002 (2001); one count of First-degree Child Sexual Abuse (vaginal penetration), in violation of D.C.Code § 22–3008 (2001); and one count of Enticing a Child, in violation of D.C.Code § 22–3010 (2001). Lessane entered pleas of not guilty to all counts. Before his first trial, the court granted the government's motion to dismiss the counts charging First-degree Sexual Abuse and Enticing a Child. Thus, the sole

charge at Lessane's first trial was the count of First-degree Child Sexual Abuse (vaginal penetration). When the jury was unable to reach a verdict on that charge, the court declared a mistrial.

2. At the time, J.P. had a contract with her parents to conform to certain behavioral expectations; violation of the contract could have subjected her to sanctions that included, she believed, commitment to inpatient mental health and/or substance abuse treatment.

bar. At approximately 12:30 a.m., J.P. and Lessane took a taxi back to Lessane's apartment in Southeast, where J.P. spent the night. The next morning, J.P. called a friend's mother, Virginia Wilson, from the District and told her that she had awakened in a strange man's apartment and could not remember what had transpired. Ms. Wilson instructed J.P. to take a Metrorail train back to Fairfax County.

At the train station in Virginia, J.P. was met by Fairfax County police officers and was eventually transported to the Woodburn Mental Health Center (Woodburn) in Fairfax County for a mental health evaluation. The supervisor of Woodburn's Emergency Service Crisis Intervention Team interviewed J.P. and her parents separately and then together and determined that J.P. did not require psychiatric commitment. When she was first interviewed, J.P. claimed that she had been abducted and raped, but she did not admit what she herself had done in the hours leading up to those alleged events. J.P. later testified at trial that she wanted to tell the truth, but she still feared the consequences of her parents finding out about her misbehavior. Eventually, however, she realized that "no one believed [her]," and that she would have to tell the truth to "get any help." J.P. therefore admitted that she had left school early the day before, used intoxicants, gone to a bar in Georgetown, met a man (i.e., Lessane), and accompanied him back to his apartment. There, she said, the man had forcibly raped her.

As a result of these disclosures, J.P. was taken to Children's National Medical Center (Children's Hospital) in the District during the night of January 15 to 16, 2002, where she was interviewed and examined by medical personnel, and a sexual assault kit was completed. No ligature marks or other external injuries were observed. The sexual assault examination, however, revealed a posterior fourchette [3] tear that would have occurred in the preceding 72 hours. Swabs were taken from inside J.P.'s vagina and rectum, as well as from her lips and the panties she wore during the night she spent in the District. She was also interviewed at Children's Hospital by a Metropolitan Police Department (MPD) detective, who then drove her through Southeast, where she identified Lessane's apartment building as the scene of the assault. J.P. additionally provided the detective with a description of her attacker, as well as a camera and film she had with her on the night in question which she had used the next morning to photograph the exterior of her assailant's apartment building. Twelve days later, J.P. viewed a nine-person photographic array arranged by the MPD and unhesitatingly chose a picture of Lessane as depicting her assailant. Subsequently, Lessane was arrested, a search warrant was executed at his apartment, and he was required to provide blood, hair, and saliva samples for DNA analysis; this analysis revealed that Lessane's DNA matched that of semen traces recovered from the swabs taken inside J.P.'s vagina and rectum during her sexual assault examination.

## B. Additional Government Evidence

The government's theory was that Lessane approached J.P. in Georgetown, bought her drinks at a bar, and then took her back to his apartment, where he forcibly penetrated her vagina and then penetrated her anus after she lost consciousness following the initial assault. Dr. Ann

---

**3.** The posterior fourchette connects the labia majora and minora in the lower portion of the vagina.

Abel, an expert in pediatrics, child sexual abuse, and child sexual abuse examinations, testified as to the significance of the sexual assault examination's findings. A posterior fourchette tear, she stated, is ordinarily caused by a fall onto a penetrating object, such as a picket fence, or "direct sexual trauma" from a rigid object such as an erect penis. Given that J.P. had no other injuries, Dr. Abel surmised that direct sexual trauma was the most likely cause of the injury. Dr. Abel also testified that recent research in the field of sexual assault examinations has established that such assaults often leave no visible injuries. Finally, she noted that "it is more common for [youthful victims of sexual assault] not to immediately disclose [the assault] than it is for them to immediately disclose [it]."

J.P. herself testified that on the evening in question, she had left her friend's house in Fairfax County alone. She first went to a Virginia Railway Express station to catch a train to the District. The trains had stopped running by that time of the night, however, so she caught a ride into the District with an elderly gentleman who had also missed his train. The man dropped her off in Georgetown, where she spent several hours walking, browsing in stores, and reading. While reading outside of a restaurant, she was approached by Lessane, who struck up a conversation with her. J.P. said she accompanied Lessane to a jazz club, where he paid her cover charge and got her past the doorman by saying she was with him. After they had conversed and shared a few drinks, Lessane offered to let J.P. sleep at his apartment. She agreed, she testified, but only after clearly informing him she had no sexual interest in him. According to J.P., Lessane assured her that he did not want her to do anything that made her feel uncomfortable. The two then traveled by cab back to appellant's apartment at 1101 Third Street, Southeast.

J.P. testified that after they arrived, Lessane told her to make herself at home. He then took a shower, while she drank some juice in the kitchen. J.P. testified that she heard the water in the shower stop, and then Lessane, who was naked, grabbed her from behind and forced her to the floor on her stomach. Using one hand to cover her mouth, Lessane used the other to pull down her jeans and panties. J.P. stated that Lessane then penetrated her vaginally from behind. As J.P. attempted to fight him off, he told her to hold still or it would hurt more. J.P. did not testify to any anal penetration.

J.P. testified that after the assault, she lost consciousness. The next thing she was able to recall was awakening after sun-up wearing only her shirt and bra; her hands had been tied with a necktie to the frame of Lessane's bed. J.P. testified that with Lessane still asleep in bed, she was able to extricate herself, whereupon she quickly and quietly gathered up her belongings and left through the unlocked door. She also stated that she noted Lessane's apartment number as she left and took pictures of the exterior of his apartment building with a camera she had brought with her. Not knowing where she was, J.P. walked to a nearby church, from which she telephoned Virginia Wilson, whom she trusted to give her good advice and to inform her about what was happening with her parents.

## C. Defense Evidence

The defense theory was that J.P., fearing that her parents were on the verge of having her committed for substance abuse and mental health problems, concocted the story of the sexual assault. Testifying in his own defense, Lessane stated that J.P. was already at the bar when he arrived on

the night in question, and that she approached him first by asking for a cigarette. Reasonably believing her story that she was a college junior because of her mature appearance[4] and her presence in a bar that routinely carded its patrons at the door, he then engaged her in conversation, bought her drinks, and eventually offered to let her stay at his apartment in response to her story that she did not have a ride home that night. Lessane stated that neither of them expressed any sexual interest in the other. According to Lessane, the only awkwardness that occurred between them was later at his apartment when J.P. asked if he had or knew where she could get some drugs. Once he informed her that he neither took drugs nor allowed them in his residence, the matter was quickly dropped. Lessane testified that he slept in his own bed, J.P. slept on the floor, and absolutely no sexual contact occurred between them. He also testified that J.P. left the next morning while he was in the shower, and that he neither saw nor heard from her again until after he was arrested.

In an apparent attempt to counteract the government's DNA evidence, Lessane also explained that earlier on the night he encountered J.P., he had sex in his apartment with a man named Tony, whom he had met a couple of days earlier at a lounge and to whom he had given his work telephone number. He testified that he did not know Tony's last name, address, or telephone number, and that Tony was between jobs when they met. Tony had called him, Lessane stated, and the two had arranged to have sex at Lessane's apartment. Lessane testified that while having sex with Tony, he had ejaculated into a condom, which he then removed, tied shut, and placed on its wrapper by the bed. He had then forgotten about the

condom until the next day after work, when he was tidying up his apartment. As he picked up the bedding J.P. had slept on from the floor, he found the condom wrapper, but not the condom itself. Lessane stated that he had surmised, to his embarrassment, that J.P. must have seen the condom and thrown it away, but he acknowledged that he never saw it in his trash receptacle. While he had thought this was odd he did not dwell on it at the time. Lessane also presented expert testimony that semen in a tied-up condom would degrade more slowly than semen that had been emitted into a human orifice and that such semen could be removed from the condom and manually inserted into human orifices in such a way as to be detectable during a sexual assault examination.

In addition to his own testimony, Lessane presented three witnesses (the detective who met J.P. at the train station in Virginia, the supervisor who interviewed her at Woodburn, and one of J.P.'s former friends) who testified to contradictory accounts J.P. had given them of the night's events. He also presented the testimony of J.P.'s confidant, Virginia Wilson, who acknowledged that J.P. feared her parents were going to send her to an institution. The defense further established on cross-examination of Dr. Abel, the government's sexual assault expert, that in at least one documented case, a posterior fourchette tear had occurred when a person with long fingernails had gouged the area digitally and that no suturing was necessary to repair J.P.'s injury.

## II.

### A. The Innocence Protection Act of 2001

Appellant argues that because he stood accused of a crime of violence, the trial

---

4. Lessane testified that J.P. was about six feet tall when they met.

court was required to provide him with pre-trial advice on DNA testing under the Innocence Protection Act of 2001 (the IPA)[5] and that its failure to comply with this requirement "mandates reversal of [his] conviction and a new trial." Appellant further asserts that the trial court's failure "is exacerbated by several factors," including the reliance the government placed on DNA evidence at trial, the fact that the defense did not actually have the evidence tested, the trial court's refusal to allow him to inquire on cross-examination into the government's failure to test a head and pubic hair of unknown origin found on the victim's person but not entered into evidence, and what he characterizes as "the error in permitting the prosecutor to elicit testimony highlighting the fact that the defense could have tested the evidence himself."

 Preliminarily, we note that because appellant did not raise his objection to lack of notice under the IPA in the proceedings before the Superior Court, we review this claim for plain error. *See, e.g., Shepherd v. United States,* 905 A.2d 260, 262 (D.C.2006) (plain error review of claim raised for the first time on appeal that the D.C. Bias–Related Crimes Statute is unconstitutional); *United States v. Vonn,* 535 U.S. 55, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002) (plain error review of claim raised for the first time on appeal that trial court failed to advise defendant, as required by Rule 11 of the Federal Rules of Criminal Procedure, that he had a right to counsel at trial if he did not plead guilty).[6] Under

---

5. The sections of the IPA cited by appellant state:

 **Pre-conviction DNA testing.**
 (a) Prior to trial for or the entry of a plea to a crime of violence, the defendant shall be informed in open court of physical evidence seized or recovered in the investigation or prosecution of the case which may contain biological material and of the results of any DNA testing that has been performed on such evidence.
 (b) A defendant charged with a crime of violence shall be informed in open court:
 (1) That he or she may request or waive independent DNA testing prior to trial or the entry of a plea if:
 (A)(i) DNA testing has resulted in the inclusion of the defendant as a source of the biological material; or
 (ii) Under circumstances that are probative of the perpetrator's identity, DNA testing has resulted in the inclusion of the victim as a source of the biological material; and
 (B) There is sufficient biological material to conduct another DNA test;
 (2) That he or she may request or waive DNA testing of biological material prior to trial or the entry of a plea if the biological material has not been subjected to DNA testing; and
 (3) Of the potential evidentiary value of DNA evidence in the defendant's case and

the consequences of requesting or waiving DNA testing.
 (c) A defendant who makes a knowing, intelligent, and voluntary waiver of DNA testing or independent DNA testing pursuant to subsection (b) of this section prior to trial or the entry of a plea is not eligible for post-conviction DNA testing under § 22–4133 unless the defendant is entitled to have the conviction to which the DNA evidence relates set aside under § 23–110 or Rule 32 of the Superior Court Rules of Criminal Procedure.
 D.C.Code § 22–4132 (2006 Supp.).

6. Appellant asserts that this court should review his claim *de novo* because the statutory interpretation issue he raises is one of law and because "it seems incongruous, and fundamentally unfair, to limit a defendant to plain error review when the error being challenged is a statutory requirement that the trial court inform him or her of a procedural right so that he might avail himself of it at trial." As to the first point, our recent case of *Shepherd, supra,* 905 A.2d at 262–63 demonstrates that even the paradigmatic legal question of a statute's constitutionality, raised for the first time on appeal, is subject to plain error review. As to the second, the Supreme Court confronted a similar claim—that applying plain error review to the court's failure to provide required notice "discount[s] the

the plain error doctrine, this court may, at its discretion, "notice defects raised for the first time on appeal if substantial rights were clearly and prejudicially denied below." *(Linwood) Johnson v. United States*, 387 A.2d 1084, 1088 (D.C.1978). To satisfy the plain error test, however, the defendant bears the burden of demonstrating that "there [was] 'error,' *i.e.*, '[d]eviation from a legal rule,' " that was " 'plain,' *i.e.*, 'obvious' or 'clear under current law,' " and that " 'affect[ed] [his] substantial rights.' " *(Danny Lee) Johnson v. United States*, 812 A.2d 234, 242 (D.C.2002) (quoting *United States v. Olano*, 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Even then, we will not reverse unless the defendant makes the additional showing of "either a miscarriage of justice, that is, actual innocence; or that the trial court's error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.' " *Wilson v. United States*, 785 A.2d 321, 326 (D.C.2001) (quoting *Olano, supra*, 507 U.S. at 736, 113 S.Ct. 1770).

■ In this case, we need look no further than the statute's plain language to determine that a trial court's failure to ensure that a defendant received the specified notifications under D.C.Code § 22–4132 would be a deviation from a clearly-established legal rule. *See United States v. Young*, 376 A.2d 809, 813 (D.C.1977) ("If the meaning of a statute is plain on its face, resort to legislative history or other extrinsic aids to assist in its interpretation is not necessary.") The statute unambiguously states that the notifications "shall" be made before trial in open court; the trial court thus does not have discretion to alter or ignore these requirements. *See Leonard v. District of Columbia*, 801 A.2d 82, 84–85 (D.C.2002) ("the normal rule is that verbs such as 'must' or 'shall' denote mandatory requirements ... unless such construction is inconsistent with the manifest intent of the legislature or repugnant to the context of the statute") (internal quotation marks and citations omitted).[7] The government does not contest appellant's basic assertions that § 22–4132 applies to his case and that its provisions were not complied with during the proceedings at issue, and the record before us does not indicate otherwise. Plain error therefore appears to have occurred.

Appellant has not shown, however, that the deviation affected his substantial rights, much less that it seriously affected the fairness, integrity or public reputation of proceedings. Appellant insists that had he been advised of his rights, "he would have requested testing." Yet he does not allege that the semen recovered from complainant's body and clothing did not belong to him. Indeed, he reiterates in his briefs

judge's duty to advise the defendant by obliging the defendant to advise the judge"—in *Vonn, supra*, 535 U.S. at 73, 122 S.Ct. 1043. There, the Court reasoned that the "point of the plain error rule" is to promote finality by "requir[ing] defense counsel to be on his toes, not just the judge" and by requiring a defendant "who just sits there when a mistake can be fixed" to bear the burden of proving that his substantial rights were affected "when he speaks up later on." *Id.* Our decision here is thus guided by the Supreme Court's rationale that "[i]t is fair to burden the defendant with his lawyer's obligation to do what is reasonably necessary to render the [proceedings]

effectual and to refrain from trifling with the court." *Id.* at 73 n. 10, 122 S.Ct. 1043. This must be especially true where, as here, the defendant was represented by counsel at both his original trial and retrial.

7. We have recently held that while D.C.Code § 22–4132 "does not specify who shall inform the defendant, or the form that the notice should take," *Veney v. United States*, 929 A.2d 448, 460, 2007 D.C.App. Lexis 472, *26 (D.C. 2007), "the trial judge ... is ultimately responsible for seeing to it that the required information is given to a defendant in open court...." *Id.*

that his theory of the case depended upon such a link to him and that the presence of his semen in the complainant's vagina and rectum was a part of an elaborate scheme the 14–year–old complainant hatched on the spur of the moment upon finding the condom to frame him for rape so she could divert attention from her own misbehavior.

Appellant instead dwells upon two hairs, one of them a pubic hair and one a grey head hair, recovered from the complainant's person during the sexual assault examination at Children's Hospital. His points seem to be that the FBI analyst selectively choose to ignore the hairs, which were never entered into evidence, when deciding what evidence to test for DNA, and that the hairs could have led to evidence that would have impeached the complainant's credibility by demonstrating that she had been sexually active with someone else during the relevant time frame "despite plaintiff's denial of any such contact." Yet these arguments are, as the trial court aptly characterized them, "red herrings."

The essential issue at trial was whether appellant had intercourse with J.P. Even if analysis of the disputed hairs could have tended to indicate that J.P. was sexually active with persons other than appellant during the relevant time frame (a questionable premise in itself, as the presence of someone's hair on another person's body hardly establishes sexual intimacy) the trial judge correctly ruled that this evidence would have been irrelevant.[8] Whatever DNA testing of the hairs might have shown, it would not have proven that the other biological material recovered from the complainant's body came from someone other than appellant, nor could it have proven that appellant did not commit the crime. Since appellant has demonstrated no prejudice from the lack of notification, he cannot prevail under plain error review.

■ Nor are we persuaded, as appellant asserts, that a failure to provide the IPA's required notifications—even when no objection is made to the failure—requires reversal as a matter of law. The statute is devoid of any language mandating reversal of an otherwise valid conviction because of the court's failure to comply with its pre-trial notification requirements. Instead, the provisions appellant cites focus on the consequences of a "knowing, intelligent, and voluntary waiver" of the right to request pre-trial testing, which is that the defendant cannot avail himself of the Act's post-conviction testing provisions unless he also qualifies for relief under D.C.Code § 23–110 (D.C.'s statutory equivalent of *habeas corpus*) or Rule 32 of the Superior Court Rules of Criminal Procedure (which allows the court to grant a motion to withdraw a guilty plea and to set aside a conviction after sentence to prevent manifest injustice or because of a fatal defect in the Rule 11 proceedings). D.C.Code § 22–4132(c). Thus, to the extent that inferences are available from the plain text, the legislation seems concerned not only with expanding the right to DNA testing when it could prove actual innocence but also with ensuring that a defendant who does not seek testing in a timely fashion cannot frivolously disturb his conviction by doing so after trial.

---

**8.** Such evidence likely would also have been inadmissible because of the District's rape shield law, under which "evidence of a victim's sexual history with someone other than the defendant is generally inadmissible." *Bryant v. United States,* 859 A.2d 1093, 1104 (D.C.2004) (citing D.C.Code §§ 22–3021,– 3022 (2001)). In any event, examination of the record reveals that, contrary to appellant's assertions on appeal, J.P. did not make any representations about whether or not she had been sexually active with anyone else, and thus she could not have been impeached on this point.

The legislative history also provides no indication that the Council intended to provide for reversal as a matter of law in the event the IPA's pre-trial notification provisions were not followed. Generally, it indicates that the IPA was prompted by a concern that existing post-conviction remedies for the wrongly-convicted were not always adequate: "During consideration of the 'Innocence Protection Act of 2001,' Judiciary Chairperson Patterson stated that every measure should be taken to allow wrongfully-convicted individuals the opportunity to prove their innocence with non-biological evidence as well as DNA." D.C. COUNCIL, COMM. ON THE JUDICIARY, DRAFT REPORT ON ADDENDUM TO BILL 14–153, THE INNOCENCE PROTECTION ACT OF 2001, at 5 (Jan. 29, 2002) (COUNCIL REPORT); *see also Bouknight v. United States*, 867 A.2d 245, 251 (D.C.2005) (noting the Act was intended to "eliminate the absence of a judicial remedy for persons who obtain new evidence that affirmatively shows their innocence more than three years after conviction or plea of guilty"). It further reveals, however, that the drafters sought to reconcile the IPA's animating principles with concerns of the United States Attorney's Office that the bill as originally written would inundate the courts with baseless claims and undermine the finality and peace of mind that criminal convictions provide to the victims of crime. *See generally* COUNCIL REPORT. Thus,

[t]he notice provisions relating to *pre-trial* DNA testing—codified in D.C.Code § 22–4132(a) and (b)—were added late in the legislative process as part of an amendment that foreclosed defendants who had made a "knowing, intelligent, and voluntary waiver" of pre-trial DNA testing from obtaining post-conviction testing under § 22–4133.

*Veney, supra*, 929 A.2d at 460, 2007 D.C.App. Lexis 472, *28 (emphasis in original). In other words, the IPA was amended with the pre-trial notification provisions to ensure that defendants did not abuse its post-trial testing procedures.

In summary, we conclude that the Council meant to remove impediments to DNA testing when it might prove that the wrong person had been convicted of a violent crime. The IPA's pre-trial notification requirements, however, are meant to be procedural, rather than substantive. The goal is to require a defendant to act in a timely fashion. The IPA does not require reversal as a matter of law, regardless of a defendant's failure to object at trial, when a trial judge has failed to comply with the pre-trial notification requirements.[9]

## B. Prosecutorial Vindictiveness

 Appellant also contends that the addition of the anal penetration count to the superceding indictment establishes a presumption of vindictiveness that has not been rebutted by the government, claiming that the seventeen-month period between

---

**9.** We also decline to assume that the trial court needs to be prodded into complying with the law by the "threat" of summary reversal. In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court confronted the question of whether the exclusionary rule should apply when evidence is obtained in good-faith reliance on a defective warrant. The court reasoned that the deterrent rationale of the exclusionary rule did not apply to judges, who, as "neutral judicial officers" with "no stake in the outcome of particular criminal prosecutions," had other professional incentives to comply with the Fourth Amendment, avoid mistakes, and demonstrate impartiality. *Id.* at 917, 104 S.Ct. 3405. Similarly, we trust the professionalism of the Superior Court judges will ensure routine compliance with the IPA. Where mistakes occur, however, they are best addressed on a case-by-case basis rather than with a broad, *per se* rule that will often contravene the IPA's goal of leaving legitimate convictions undisturbed.

the alleged offense and the first trial supports this claim because the additional count could have been added before that trial. While defendant acknowledges that this issue was not raised below, he submits, citing *United States v. Gary*, 351 U.S.App. D.C. 380, 384, 291 F.3d 30, 34 (2002) (quoting *Maddox v. Elzie*, 345 U.S.App. D.C. 58, 67, 238 F.3d 437, 446 (2001)), that " 'a presumption of vindictiveness may be warranted in cases in which a reasonable likelihood of vindictiveness exists,' " and that the court's failure to address this issue—apparently *sua sponte*—constitutes plain error requiring reversal. While stopping short of alleging actual maliciousness on the part of the government, appellant asks this court to apply this as a "prophylactic rule" on appeal. *See United States v. Schiller*, 424 A.2d 51, 55 (D.C. 1980). We review the claim that the trial court failed to address the issue of vindictive prosecution for plain error.

*United States v. Mahdi*, 777 A.2d 814 (D.C.2001), illustrates that the appropriate procedure following a claim of prosecutorial vindictiveness is for the defendant to file a motion with the trial court seeking relief, for the trial court to hold a hearing to ascertain the circumstances underlying the claim, and for the trial court to decide whether the allegations give rise to a realistic likelihood of prosecutorial vindictiveness. Indeed, the opinion relates at some length the various findings that the trial court in *Mahdi* made in connection with the hearing that was held.

Here, however, the appellant is asking that we find error on the part of the trial judge in failing to raise, *sua sponte*, the issue of prosecutorial vindictiveness based upon the addition of a charge following the hung jury. We cannot so find. Appellant, by never filing a motion alleging vindictive prosecution, short-circuited the process that would have allowed him and the government to provide the trial court with the information upon which to make a decision. Moreover, in its brief on appeal, the government represents, and appellant does not dispute, that the DNA analysis showing that appellant's DNA was identified on the rectal swabs taken from J.P. was not available at the time of the original indictment, and as J.P. testified at trial, she had no memory of anal penetration. Thus, there appears to be a legitimate and uncontested reason proffered within the briefs why the anal penetration count was not in the original indictment.[10]

Moreover, to prevail on plain error review, appellant must demonstrate that his substantial rights were affected by the addition of a count on which he was ultimately *acquitted. See Wilson, supra*, 785 A.2d at 326;[11] *(Danny Lee) Johnson, supra,*

10. We find entirely unpersuasive the argument that the fact that the government had the DNA analysis for some months before seeking the superceding indictment somehow demonstrates vindictiveness.

11. Citing *United States v. Meyer*, 258 U.S.App. D.C. 263, 810 F.2d 1242, *op. vacated*, 259 U.S.App.D.C. 391, 816 F.2d 695, *op. reinstated on recons. sub nom Bartlett on Behalf of Neuman v. Bowen*, 263 U.S.App.D.C. 260, 824 F.2d 1240 (1987), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988), appellant contends that not only should the First-degree Sexual Abuse (anal penetration) charge on which he was acquitted be dismissed for prosecutorial vindictiveness, but also the First-degree Sexual Abuse (vaginal penetration) charge. First, *Meyer* is not binding on this court. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). Moreover, it provides little support for the appellant's argument that the charge of First-degree Sexual Abuse (vaginal penetration) should be dismissed. As the court wrote: "We ... do not encourage routine imposition of this broad remedy [of dismissing all charges simply because prosecutorial vindictiveness could be found with respect to one charge.]" "[I]ndeed," the court continued, "we counsel lower courts to inspect closely both factual cir-

812 A.2d at 242; (Linwood) Johnson, supra, 387 A.2d at 1088 (under the plain error doctrine, this court may, at its discretion, "notice defects raised for the first time on appeal if substantial rights were clearly and prejudicially denied below"). Appellant has not, however, alleged any connection between the addition of the anal penetration count on retrial and his conviction of the vaginal penetration count. Thus, having failed to file a motion below, having been acquitted of the anal penetration charge, and having failed to proffer that there was any connection between that charge and the vaginal penetration charge on which he was convicted, appellant is unable to show that the trial court's failure to address this issue *sua sponte* was a miscarriage of justice or that his substantial rights were violated by the addition of this charge.

## C. Burden–Shifting

▮ Appellant also asserts that the government engaged in impermissible burden-shifting with respect to the DNA testing done by the FBI. This contention arises from the defense's cross-examination of the government's DNA expert, when defense counsel elicited that although 29 items of evidence collected during the investigation of the case were sent to the FBI laboratory, not all of these items were tested for the presence of DNA even though the MPD requested DNA testing on "all applicable items."

During re-direct examination, the government sought leave to ask the analyst whether the defense, as well as the government, had the right to test the items. The defense objected, asserting that such a question would involve shifting the burden of proof to the defense. The trial court granted the government's request on the basis that the defense's questions had attempted to create the impression that the FBI's testing had been selectively performed to skew the results by focusing only on the items most damaging to appellant, while ignoring items that could have helped to exculpate him. That is, left unaddressed, the defense's questions would have tended to indicate that the FBI's testing procedures were biased. Thereafter, the government asked only one more question on re-direct: "[W]ith regard to the items that were submitted to the DNA Analysis Unit for evaluation ... in the District of Columbia does the defense have the right to have those items also scientifically tested?" The DNA expert responded that he "believed so." [12]

▮ A trial court's decision to admit evidence as more probative than prejudicial may be reversed only for abuse of discretion. *Hartridge v. United States*, 896 A.2d 198, 216 (D.C.2006); (William) *Johnson v. United States*, 452 A.2d 959, 960 (D.C.1982). We conclude that the trial court did not abuse its discretion by permitting the government to ask this one question to counter the implication that the FBI's approach to testing the evidence in this case was biased. *See Hartridge, supra,* 896 A.2d at 216. "Redirect examination is limited to matters which were first raised on cross-examination, to which the opposing party is merely responding on redirect." *Rose v. United States*, 879 A.2d 986, 993 n. 3 (D.C.2005) (internal quotation marks and citations omitted). That is exactly what happened here. *See*

cumstances and remedial alternatives before dismissing entire informations." *Id.*

12. *But see Ventura v. United States,* 927 A.2d 1090, 2007 D.C.App. Lexis 391 (D.C. 2007),

holding that § 22–4132(b)(2) "does not confer an automatic 'right' to pre-trial DNA testing upon request."

*also Parker v. United States,* 757 A.2d 1280, 1286–87 (D.C.2000).

### D. Comments on the Defendant's Presence at Trial

 Appellant also assails the prosecution's conduct during its closing argument. The first assignment of error concerns the government's comments on appellant's presence at trial. Near the end of the government's summation, the prosecutor argued as follows:

> Let's talk about Tony for a second. Ladies and gentlemen, isn't it convenient that the defendant, I think *sua sponte* on his own, sort of said, but I never ask for anybody's last name, it's not something that I do? Isn't it convenient that he doesn't know where Tony lives? Who is Tony? We don't know. Isn't it convenient that Tony is unemployed? There's no way to contact him at work. Isn't it convenient that only the defendant, but not Tony, used a condom, and that Tony ejaculated on himself leaving nothing behind? Convenient. Isn't it convenient that only [the complainant] apparently saw the condom, and the condom was tied so that the semen stays more viable? It's all too convenient.

> Ladies and gentlemen, the defendant is in a unique position here. He's the one person who gets to see all the evidence through the trial and hear all the testimony—

> [At this point, the defense objected and the court overruled the objection.]

> What he's trying to do, he's trying to navigate the evidence and come up with a story.

Defense counsel then renewed his objection, and the following colloquy occurred during a bench conference:

> [DEFENSE]: This is absolutely improper, and I move for a mistrial.

> THE COURT: You are not supposed to be arguing that, because the Court of Appeals says—

> [PROSECUTION]: A United States Supreme Court decision says it is not improper.

> THE COURT: Go on to something else.

> [DEFENSE]: For the record, I am moving for a mistrial.

> THE COURT: I will deny your motion for mistrial.

Appellant now argues that the prosecutor's statements to the effect that appellant's presence in court allowed him to fabricate a story in response to the government's evidence "flout(s) ... unambiguous holdings" of this court which prohibit such tactics.

In *Jenkins v. United States,* 374 A.2d 581, 584 (D.C.1977), we held that the government's "suggest[ion] that appellant's presence during trial facilitated his ability to fabricate" was "improper, and ... should not [have] be[en] countenanced by the trial court" because it interfered with the appellant's "exercise of his right to confront the witnesses against him." The government, however, argues that *Portuondo v. Agard,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000), supersedes the *Jenkins* line of cases by explicitly holding that comments by the prosecution that the defendant has the opportunity to tailor his testimony to the government's evidence do not violate a defendant's constitutional rights. This is the first occasion on which this court has been required to address the *Portuondo* decision, and therefore presents the question of whether this aspect of *Jenkins* remains good law in the District. We review this issue *de novo. See United States v. Felder,* 548 A.2d 57, 61 (D.C. 1988).

*Jenkins* relied upon *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14

L.Ed.2d 106 (1965), for its holding that the prosecutor's remarks were improper. *Jenkins, supra,* 374 A.2d at 584. *Griffin,* in turn, held that the Fifth and Fourteenth Amendments to the United States Constitution forbid the prosecution or the court from making comments inferring that a defendant's decision not to testify is evidence of guilt. *Griffin, supra,* 380 U.S. at 615, 85 S.Ct. 1229. Yet unlike this court in *Jenkins,* the Supreme Court in *Portuondo* specifically rejected the proposition that *Griffin's* reasoning also applied to a prosecutor's comments that a criminal defendant who testified could tailor his testimony to the government's evidence: "Respondent's argument boils down to a request that we extend to comments of the type the prosecutor made here [13] the rationale of *Griffin v. California.* ... We decline to extend *Griffin* to the present context." *Portuondo, supra,* 529 U.S. at 65, 120 S.Ct. 1119.

In reaching that conclusion, the majority reasoned that *Griffin's* holding that a defendant's decision not to testify cannot be used against him by the jury was based upon something that the jury was not permitted to do, that is, punish a defendant for exercising his right not to testify. Moreover, the opinion concludes that "[i]t is reasonable enough to expect a jury to comply with that instruction since ... the inference of guilt from silence is not always 'natural or irresistible.'" *Id.* at 67, 120 S.Ct. 1119, citing *Griffin, supra,* 380 U.S. at 615, 85 S.Ct. 1229. For example, "[a] defendant might refuse to testify simply out of fear that he will be made to look bad by clever counsel, or fear that his prior convictions will prejudice the jury." *Portuondo, supra,* 529 U.S. at 67, 120 S.Ct. 1119 (internal quotation marks and citation omitted).

In contrast, reasoned the Court, "it *is* natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testified last, to have in mind and weigh in the balance the fact that he heard the testimony of all those who preceded him." *Id.* at 67–68, 120 S.Ct. 1119. Indeed, the majority concluded, it is "quite impossible" for the jury "to evaluate the credibility of the defendant's testimony while blotting out from its mind the fact that before giving the testimony the defendant had been sitting there listening to the other witnesses." *Id.* at 68, 120 S.Ct. 1119. See also *State v. Alexander,* 254 Conn. 290, 755 A.2d 868, 874 (2000), where the Supreme Court of Connecticut, applying *Portuondo* for the first time, concluded that "[i]t was proper for the prosecutor to request that the jury generally consider the defendant's unique opportunity when determining the credibility of his testimony," and referred to *Portuondo's* reliance on *Perry v. Leeke,* 488 U.S. 272, 282, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), where the Supreme Court wrote that when a defendant "assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him as well." *Id.* at 873. As

---

**13.** The prosecutor's comments in *Portuondo* were very similar to those to which appellant objects:

> You know, ladies and gentlemen, unlike all the other witnesses in this case the defendant has a benefit and the benefit that he has, unlike all the other witnesses, is he gets to sit here and listen to the testimony of all the other witnesses before he testifies.
>
> * * *

> That gives you a big advantage, doesn't it[?] You get to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence?
>
> * * *

> He's a smart man. I never said he was stupid.... He used everything to his advantage.

*Portuondo, supra,* 529 U.S. at 64, 120 S.Ct. 1119.

did *Alexander*, we find the reasoning of *Portuondo* to be persuasive.

Nevertheless, appellant argues and the government concedes that a constitutional decision by the Supreme Court does not prevent state courts from using their supervisory authority to maintain more stringent local standards to deter prosecutorial misconduct. Appellant, however, has presented no authority that would indicate that this was, in fact, what this court was trying to do in *Jenkins* and the subsequent cases that rely on that decision. To the contrary, *Jenkins* relied specifically on *Griffin*, a constitutional decision of the Supreme Court. *See Simpson v. United States*, 877 A.2d 1045, 1050 n. 4 (D.C.2005) ("In *Griffin*, the Supreme Court held that a comment to the jury about the defendant's refusal to testify at trial violated the defendant's constitutional rights."); *see also Dyson v. United States*, 418 A.2d 127, 131 (D.C.1980) ("We have construed such an argument as an apparent attempt by the prosecutor to have the jury draw adverse inferences from appellant's exercise of his constitutional right to confront witnesses."); *Fornah v. United States*, 460 A.2d 556, 560–61 (D.C.1983) ("[I]t is impermissible to attempt to cause the jury to draw adverse inferences from appellant's exercise of his constitutional right to confront witnesses against him."); *Sherrod v. United States*, 478 A.2d 644, 657 (D.C.1984) ("[A] prosecutor's comment during closing argument on a defendant's decision to testify last has been construed by this court as an attempt to have the jury draw adverse inferences from the defendant's exercise of his constitutional right to confront witnesses and is thus impermissible."); *Hart v. United States*, 538 A.2d 1146, 1149 (D.C.1988) ("Drawing an adverse inference from the defendant's exercise of his constitutional right to confront witnesses is impermissi-

ble. . . ."); *Mitchell v. United States*, 569 A.2d 177, 183 (D.C.1990) ("the prosecutor's statement in rebuttal closing argument impermissibly suggested . . . an adverse inference from appellant's exercise of his constitutional right to confront witnesses"). All these cases assumed, based on the *Jenkins* court's reading of *Griffin*, that a defendant's Sixth Amendment confrontation rights included the right to listen to the testimony of all other witnesses before testifying *and* the right to testify without the prosecutor commenting on the effect these circumstances have on the defendant's credibility as a witness. The Supreme Court, however, has determined that no such constitutional right exists. *Portuondo, supra*, 529 U.S. at 69, 120 S.Ct. 1119.

We have long held that a division of this court may not overrule the prior decision of another. *M.A.P., supra*, 285 A.2d 310 at 312. However, a "panel cannot blindly follow [a] prior ruling in the face of clearly controlling doctrine later enunciated by the Supreme Court." *Frendak v. United States*, 408 A.2d 364, 379 n. 27 (D.C.1979) (citing *Ralpho v. Bell*, 186 U.S.App.D.C. 368, 390, 569 F.2d 607, 629 (1977)). Where, as in *Jenkins*, this court purports only to comply with the commands of the United States Constitution, the stability of its holdings is subject to the Supreme Court's ultimate authority to interpret that document. *See Lenkin Co. Mgmt., Inc. v. District of Columbia Rental Hous. Comm'n*, 677 A.2d 46, 49 (D.C.1996) (citing *M.A.P., supra*, for the proposition that only the en banc court can overrule a panel's prior decision but noting "[a] panel decision interpreting the [Constitution] . . . would undoubtedly yield to a later Supreme Court decision on point").

In summary, we find that *Jenkins*, in its reliance on *Griffin*, was a constitutional decision that has now been

overruled by the United States Supreme Court in *Portuondo* and therefore is no longer binding on this court. We decline, moreover, to exercise our supervisory authority to prohibit the government from commenting on a defendant's ability to tailor his own testimony to the evidence. Our decisions have made plain that this court's supervisory authority is to be "sparingly exercised," *Watkins v. United States,* 846 A.2d 293, 300 (D.C.2004) (internal quotation marks and citation omitted), and we have been given no sound reason to exercise it in this context. We therefore hold that the prosecutor did not impermissibly comment upon the effect of the defendant's presence at trial on his credibility as a witness, and that the trial court did not abuse its discretion in permitting the jury to consider the remarks.[14] We note that while the Constitution would allow such comments even without specific indications of tailoring, *Portuondo, supra,* 529 U.S. at 70–71, 120 S.Ct. 1119, the government was particularly justified in using the tactic here, where it could pinpoint aspects of appellant's testimony that seemed unusually coincidental to the government's presentation.

### E. Other Prosecutorial Comments During Summation

Finally, appellant contends that the prosecution "flagrantly violated well-worn, unambiguous rules imposed by this court against articulating personal opinion in argument, vouching for the credibility of the most critical government witness (the complainant), and prohibiting aspersions on a defendant's character." Appellant quotes extensively from the prosecutor's closing argument and his rebuttal to appellant's summation, during which the prosecutor commented repeatedly on the "absolutely overwhelming" strength of the government's evidence and stated, "there is no question that the defendant sexually abused [the complainant] back in mid-January of 2002." He also characterized the appellant's own assertions as "incredible," "ridiculous," "laughable," and "outrageous." Near the end of his rebuttal, the prosecutor further stated:

Ladies and gentlemen, there's a maxim in the law that nobody is above the law, right? But you know what? Nobody is below it either. [The complainant] is not below the law because she makes bad choices and smokes marijuana. She's not. The child sexual abuse laws don't only protect perfect kids. They protect all kids, and kids like [the complainant] are the most vulnerable in our society. She's the kind of kid who is going to get sexually assaulted when she's making those unwise choices, and the laws are there to protect her, to protect her from people like that man who exploit children and rape—

Defense counsel thereupon objected, and the trial instructed the jury as follows: "Ladies and gentlemen, you should not infer anything about the defendant's character. This is only about what happened on January 15." The only other objection to the prosecutor's purportedly improper expression of opinion came earlier during the prosecutor's rebuttal argument, when he stated: "The notion that there is not sufficient evidence regarding penetration is laughable, ladies and gentlemen. It's ridiculous." That objection was overruled.

 In analyzing claims of so-called prosecutorial misconduct, we first determine whether the comments at issue were improper. *Najafi v. United States,* 886

---

14. Upon request, a trial judge may instruct the jury that a defendant has a constitutional right to be present throughout his/her trial.

*See Portuondo, supra,* 529 U.S. at 76, 120 S.Ct. 1119 (Stevens, J., concurring in the judgment).

A.2d 103, 107 (D.C.2005). If so, we will not reverse unless we also find that they caused the defendant "substantial prejudice." *Dyson, supra,* 418 A.2d at 132. We must also bear in mind that "[a] criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements must be viewed in context.' " *(Lamont R.) Jones v. United States,* 739 A.2d 348, 353 (D.C. 1999) (quoting *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

■ When a defendant has properly preserved his objections, substantial prejudice is determined on the basis of the standard first articulated in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See Washington v. United States,* 884 A.2d 1080, 1088 (D.C. 2005). Reversal is required under this standard "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239. The determinative factors are the gravity of the improper comments; their relationship to the issue of guilt; the effect of any corrective action by the trial judge; and the strength of the government's case. *Najafi, supra,* 886 A.2d at 107 (citing *Dixon v. United States,* 565 A.2d 72, 79 (D.C. 1989)).

■ Where the objections have not been properly preserved, however, we will reverse only for plain error. *Sherrod, supra,* 478 A.2d at 655. "[R]eversal for plain error in cases of alleged prosecutorial misconduct should be confined to 'particularly egregious' situations." *Irick v. United States,* 565 A.2d 26, 32 (D.C.1989) (quoting *Young, supra,* 470 U.S. at 15, 105 S.Ct. 1038). Because we review the record for legal error or abuse of discretion by the

trial judge, not by counsel, we cannot ordinarily reverse a conviction in the absence of a judicial ruling. *Id.* at 33. Nevertheless, "[s]uch error or abuse may ... embrace not only incorrect rulings but also, on occasion, failure to intervene *sua sponte* when such intervention is called for ... or to react with sufficient promptness and vigor to prosecutorial misdeeds." *Id.* (internal citations omitted). Here, we find nothing extraordinary enough in the comments to which appellant did not object to require us to consider whether the trial court nevertheless had a duty to intervene. Those claims are therefore waived.

■ Appellant raises two other alleged instances of improper opinion argument, however, to which defense counsel did object. The first was the characterization of the defense's assertions that the evidence of penetration was insufficient as "laughable" and "ridiculous." Considering this comment in context, we find no abuse of discretion in the court's overruling of the objection. Directly before making this comment, the prosecutor had recounted the government's evidence with respect to the element of sexual penetration, which included the testimony of the victim, medical evidence consistent with penetrating sexual trauma, and scientific findings that the semen found inside the victim's vagina and anus came from the appellant.

Appellant cites *Diaz v. United States,* 716 A.2d 173, 179–80 (D.C.1998), for the proposition that a prosecutor's expression of personal opinion as to the witness's credibility or veracity is improper, especially when that occurs in the prosecution's rebuttal argument and thus cannot be answered by the defense. However, "the key inquiry is whether the attorney is commenting on the evidence, which he may do, or expressing a personal opinion, which is taboo. A comment will be within the acceptable range as long as it is in the

general nature of argument, and not an *outright* expression of opinion." *Irick, supra,* 565 A.2d at 36 (emphasis in original).

Here, the prosecutor's comments were squarely within the category of commenting on the evidence and were delivered at a time when he was specifically focusing on the futility of appellant's attempt to deny the government's evidence on sexual penetration. Indeed, the comments are virtually indistinguishable from the argument that a witness's testimony is "incredible," one which "is permissible when that is a logical inference from the evidence and not merely the opinion of counsel." *Washington, supra,* 884 A.2d at 1093 (citing *McGrier v. United States,* 597 A.2d 36, 43 (D.C. 1991) (citing *Irick, supra,* 565 A.2d at 35)). Since his comments were directed at the evidence in the record, they were not improper.

■ The second preserved objection came during the prosecution's rebuttal argument in which he described the complainant as among "the most vulnerable [type of kids] in our society," and "the kind of kid who is going to get sexually assaulted when she's making ... unwise choices," and then added, "the laws are there to protect her, to protect her from people like that man who exploit children and rape—." At this point, defense counsel objected, and the court instructed the jury: "Ladies and gentlemen, you should not infer anything about the defendant's character. This is only about what happened on January 15."

While the statement would better have been left unsaid, we conclude that it had no substantial influence on the jury's verdict. *See Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239. The court immediately gave a curative instruction, and the record provides no basis to rebut the presumption that the jury understood and followed it. *See (Raymond L.) Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). The prosecutor also immediately ceased this line of argument. Most importantly, these few words were but a brief occurrence in a five-day trial during which the government presented ample and convincing evidence of the appellant's guilt. In short, taken in context, the prosecution's questionable argument cannot be said to have substantially contributed to the outcome of a trial for child sexual abuse in which the 32–year–old defendant's only explanation for why his semen was recovered from inside a 14–year–old girl's torn vagina was that she found it and put it there herself.

For the foregoing reasons, the judgment of the trial court is hereby

*Affirmed.*