*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-410

JAMES A. CORBIN, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-10713-12)

(Hon. Stuart G. Nash, Trial Judge)

(Argued February 19, 2015                    Decided July 23, 2015)

*Daniel Gonen*, Public Defender Service, with whom *James Klein* and *Alice Wang*, Public Defender Service, were on the brief, for appellant.

*Stephen F. Rickard*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Erik Kenerson*, and *Peter Lallas*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and BECKWITH, *Associate Judges*, and BELSON, *Senior Judge*.

BLACKBURNE-RIGSBY, *Associate Judge*:  The central issue on appeal is one of statutory construction, namely, whether the District of Columbia's carjacking statute, D.C. Code § 22-2803 (2001), encompasses attempted unarmed carjacking.

We conclude that it does not, and that the government must charge a suspect of attempted unarmed carjacking under our general attempt statute, D.C. Code § 22-1803 (2013 Supp.), separately from the completed offense.

Following a jury trial, appellant James Corbin was found guilty of four counts resulting from two incidents that occurred on December 16, 2007. For the first incident, involving Eva Kleederman, appellant was convicted of unarmed carjacking and robbery of Ms. Kleederman's keys.[1] For the second incident, involving Christine Cannon, appellant was convicted of unarmed carjacking and first degree theft of personal property in the car.[2] Primarily, appellant challenges the sufficiency of the evidence supporting the carjacking of Ms. Kleederman, arguing that the evidence shows that he merely attempted to take Ms. Kleederman's car, and that the carjacking statute under which he was charged and convicted does not proscribe attempted carjacking. We agree, and we vacate this conviction and remand for resentencing for attempted carjacking in accordance with our holding.

---

[1] In violation of D.C. Code § 22-2803 (a)(1) and D.C. Code § 22-2801 (2001), respectively.

[2] In violation of D.C. Code § 22-2803 (a)(1) and D.C. Code §§ 22-3211, -3212 (a) (2001), respectively.

In addition to his sufficiency claim, appellant argues that the trial court abused its discretion by: (1) permitting the government to comment, in closing argument, on appellant's right to independent DNA testing under *Teoume-Lessane v. United States*, 931 A.2d 478 (D.C. 2007), when defense counsel did not open the door to this argument, and (2) refusing to issue a proposed jury instruction on scientific research suggesting that an eyewitness's level of confidence does not correlate to reliable identification. We affirm the trial court's ruling on these claims.[3]

---

[3] Appellant also challenges the sufficiency of the evidence supporting his robbery conviction, arguing that the evidence in the record merely shows that he intended to permanently deprive Ms. Kleederman of the car's ignition key during an unsuccessful attempt to take the car, but does not show that he intended to permanently deprive Ms. Kleederman of the keys that he actually took: those attached to the ignition key. Accordingly, he contends that he should have been convicted of attempted robbery, not completed robbery. *See Lattimore v. United States*, 684 A.2d 357, 359-60 (D.C. 1996) (stating that a robbery conviction requires the government to "prove larceny and assault" and larceny includes "intent to permanently deprive").

Viewing the evidence in the light most favorable to the government and deferring to the jury's responsibility to weigh evidence, make credibility determinations, and draw reasonable inferences, *see id.* at 359, we conclude that the jury was entitled to infer that appellant "intend[ed] the natural and probable consequences of [his] acts knowingly done[,]" or in this case, to infer his intent to steal the keys attached to the ignition key, as expressed through the act of grabbing and pulling at them. *See, e.g.*, *Wilson-Bey v. United States*, 903 A.2d 818, 839 n.38 (D.C. 2006) (en banc). Evidence supporting a guilty verdict need not "negate every possible inference of innocence" in order for a jury to find that the elements of a crime are proved beyond a reasonable doubt. *In re D.P.*, 996 A.2d 1286, 1290 (D.C. 2010) (citation and internal quotation marks omitted). The jury was not

(continued . . .)

## I.   Factual Background

### A. *The Kleederman Carjacking*

On the afternoon of December 16, 2007, Ms. Eva Kleederman drove her five-year-old daughter from their home in Virginia to a violin recital at a venue on Mississippi Avenue, Southeast, Washington, D.C.  Ms. Kleederman testified at trial that she was unfamiliar with the area and became lost while following printed directions.  Upon seeing a man — presumably appellant — walking nearby, Ms. Kleederman rolled down her window and asked him for directions to Mississippi Avenue.  Ms. Kleederman described appellant as an African-American and a "slight person," about five feet and six or seven inches tall, "fifty-ish," with "salt and pepper-ish, grayish" hair and "rough . . . sandpapery . . . gravelly" skin on his face, possibly due to "a bad shave or pocked skin," wearing jeans and a mid-thigh length dark green or black "parka-looking winter jacket."  When Ms. Kleederman asked him for directions, appellant opened the passenger side door of her car "in the blink of an eye" and sat in the passenger seat, stating that he lived near

_____

(. . . continued)
compelled to infer from the evidence, as appellant argues, that he intended to steal the ignition key alone and not the other keys.  Accordingly, we hold that the evidence in the record is sufficient to support appellant's conviction for a completed robbery.

Mississippi Avenue and would direct her. Ms. Kleederman was shocked and told appellant that she does not take passengers, but he responded "that's okay. I understand. I'm an honest person." Although she felt alarmed, Ms. Kleederman "didn't want to appear biased or racist just because [she] found [her]self in . . . a part of town [she] knew to be largely black" and decided to drive on, "against [her] better judgment." Appellant directed Ms. Kleederman for about ten minutes and avoided her attempts at conversation. During the drive, Ms. Kleederman noticed a cut on appellant's middle or index finger that was "oozing . . . gelatinous blood," and later found some of this blood on the door and dashboard of her car.

Upon entering a wooded street in Fort Dupont Park, identified at trial as Fort Dupont Drive, Southeast, appellant instructed Ms. Kleederman to slow down, saying "I live near here." When Ms. Kleederman slowed down, appellant began to push her toward the driver-side door, saying "get out of the car" while trying to pull the key out of the ignition. At the same time, Ms. Kleederman began to push on the car horn and scream for help. Appellant was unable to pull the key out of the ignition, but managed to wrench away all of the other keys attached to it. He then exited the car, walked around to the driver side door, and tried to pull Ms. Kleederman out. At that moment, Mr. Amin Muslim and Mr. Stanley Daniels were driving by and stopped their car to aid Ms. Kleederman, prompting appellant

to run off into a wooded area separating Fort Dupont Drive from Minnesota Avenue, Southeast. Mr. Muslim gave chase into the woods while calling 911 on his phone but eventually lost sight of appellant as appellant exited the woods toward Minnesota Avenue.

Meanwhile, off-duty police officer Stephanie Poyner of the Metropolitan Washington Airports Authority Police Department was visiting her mother at her childhood home on G Street, Southeast, which intersects Minnesota Avenue just opposite the wooded area into which appellant had fled. Drawn by the sound of a woman screaming for help coming from the direction of Fort Dupont Park, Officer Poyner walked to the intersection of G Street and Minnesota Avenue. Looking towards the wooded area, she saw a man exit the wood line at a place where there were no trails and where she had never before seen a person enter or exit. Officer Poyner came within thirty-five feet of the man and described him as an African-American of "average weight," approximately five feet and seven inches tall, with "mixed gray hair," wearing blue pants and a black thigh-length jacket. The man crossed Minnesota Avenue and entered another wooded area behind G Street. Officer Poyner drove into Fort Dupont Park, found Ms. Kleederman, and reported what she had seen to police officers on the scene. After the incident, the United

States Park Police swabbed several smears of blood in Ms. Kleederman's car and submitted the swabs to the Federal Bureau of Investigation ("FBI").

### B. The Cannon Carjacking

Before dark that same evening,[4] Ms. Christine Cannon and her fiancé, Mr. Ahmad Johnson, were driving home after a day of shopping, in which they had filled Mr. Johnson's car full of Christmas presents. Ms. Cannon, who was three or four months pregnant at the time, asked Mr. Johnson to stop for a snack, so he parked in front of the Dollar General store at a strip mall on Pennsylvania Avenue, Southeast, and Minnesota Avenue. Ms. Cannon remained in the passenger seat of the car with the car keys in the ignition. Shortly after Mr. Johnson left, Ms. Cannon saw a man — whom she identified as appellant at trial — look into the car "like [he was] scoping." The car was unlocked and appellant swiftly entered and sat in the driver's seat and told Ms. Cannon to "get the f---[expletive] out of the car." Ms. Cannon said "no" and reached for the keys, but he hit her in her chest. Ms. Cannon attempted to open her door and call out to Mr. Johnson, but appellant pulled her door shut, saying "b----[expletive] you should have got out of the car.

---

[4] Ms. Cannon testified that she could not remember the exact time, but that "it was like evening" and not completely dark.

Now I'm going to kill you." Appellant kept his left hand in his jacket throughout the incident and, at some point, told her that he had a gun and would shoot her.

Appellant sped away with Ms. Cannon in the car, driving "like a maniac" on both sides of the road. Ms. Cannon tried to look back and appellant hit her in the jaw, saying "turn your a--[expletive] around." Eventually, Ms. Cannon covertly spilled some ginger ale on her dark jeans and told appellant that she was pregnant and believed she was having a miscarriage because she was "bleeding." The man slowed down enough to shove Ms. Cannon out of the car and then pulled away. Ms. Cannon stumbled but caught her fall, and found a ride back to the Dollar General store.

Ms. Cannon described the man who had driven the car at trial as "brown skinned," and "not a big guy," in his thirties to forties, with "salt and pepper hair" and an unshaved face "like a goatee" or "a full beard" that he was "trying to grow in." He appeared to be wearing black or blue jeans, and a "black leather or black sweatshirt with leather in it," which Ms. Cannon later referred to as a "jacket." In identifying appellant at trial, Ms. Cannon stated that his most memorable attribute were his eyes, which told her "not to play with him" during the events in question.

### C. Connecting the Crimes

Shortly after Officer Poyner left the scene of the Kleederman carjacking, she happened to be driving toward the intersection of Pennsylvania Avenue and Minnesota Avenue where the Dollar General store was located. It was evening by this time, but some daylight remained.[5] As she neared the intersection, Officer Poyner noticed the man whom she had seen running from the wooded area across Minnesota Avenue earlier in the afternoon. She testified at trial that she recognized his "clothing" and his "physical appearance." Circling around to observe him, she saw him looking into cars at a Shell gas station next to the strip mall where Ms. Cannon sat waiting in Mr. Johnson's car. Officer Poyner saw him approach and enter the driver seat of Mr. Johnson's car while a woman sat in the passenger seat. In "a matter of seconds," the car sped off and Officer Poyner followed in her personal vehicle while calling 911. The man drove erratically down Pennsylvania Avenue, Southeast, toward the Maryland border, weaving in and out of traffic and running traffic lights. Officer Poyner saw the passenger door open a couple of times and saw the man strike the woman on her head. Unable to

---

[5] Officer Poyner testified that she did not remember how much time elapsed from when she witnessed appellant cross Minnesota Avenue until she left in her car to drive toward the intersection of Minnesota Avenue and Pennsylvania Avenue, but stated that "some daylight" remained.

keep up with the speeding car, Officer Poyner returned to the strip mall and spoke with police officers.

## D. The Investigation

The investigation moved slowly and was eventually suspended. Police officers recovered Mr. Johnson's car on January 4, 2008, in the possession of two individuals who were quickly ruled out as suspects. Based on an address that these individuals provided, police officers visited the residence of a suspect but were unable to obtain any evidence tying him to the crimes at issue. Officers showed photo arrays that included this suspect to Ms. Kleederman and Officer Poyner, but neither was able to make a definitive identification. Appellant was not a suspect at this time and was not included in the photo arrays. Then, in a report dated August 3, 2010, the FBI returned a positive match for appellant from swabs of the blood recovered in Ms. Kleederman's car, which provided cause to arrest appellant.[6]

---

[6] The FBI explained at trial that the delay between 2008, when it received the swabs, and 2010, when it returned a positive match, was due to a backlog in the FBI laboratory and the low-priority of cases with no known suspect.

*E. The Trial*

The government relied on appellant's DNA match to tie him to the Kleederman carjacking. Neither Ms. Kleederman nor Officer Poyner was able to identify appellant at trial, but Officer Poyner testified that she had no doubt that the person she observed in both incidents was the same person. Ms. Cannon was able to identify appellant, however, explaining during her testimony that appellant "stands out to me like a sore thumb because of his eyes." Ms. Cannon testified that she did not notice any blood on appellant during the incident or on herself afterward.

The trial court instructed the jury on the elements of the charged crimes, explaining, with regard to the Kleederman incident, that the jury must find carjacking is an "attempt[] to take a motor vehicle from the immediate actual possession of [Ms. Kleederman] against [her] will." Appellant was convicted and sentenced to 180 months of incarceration, comprised of separate consecutive ninety-month sentences for the carjackings of Ms. Kleederman and Ms. Cannon, and concurrent sentences of ninety months for robbery and fifty-four months for first degree theft. This appeal followed.

## II.    Discussion

### A. *The Statutory Construction Issue:   Sufficiency of the Evidence in the Kleederman Carjacking*

Appellant posits that he merely attempted to take Ms. Kleederman's car and, consequently, that the evidence offered at trial was insufficient to convict him under the plain language of the carjacking statute, D.C. Code § 22-2803 (a)(1).  As a result, appellant's sentence of ninety months of incarceration, a sentence that is commensurate with actually completing the crime of carjacking, was greater than he should have received for an attempt, the sentence for which, under our general attempt statute, is capped at five years, or sixty months. *See* D.C. Code § 22-1803.

There are two parts to this argument.  The first is a sufficiency question: whether a reasonable jury could conclude beyond a reasonable doubt that appellant completed a carjacking under the statute.  If he did not, we must answer a second legal question:   whether the carjacking statute, as written, encompasses both attempted and completed offenses.

*1. Whether appellant completed a carjacking*

Appellant argues that "simply getting into someone's car and giving bad directions, even on purpose, is not a carjacking" in the District of Columbia, but rather an attempted carjacking. Ms. Kleederman willfully followed his "bad directions," he argues, and the fact that she was nervous and did not use her best judgment in doing so does not override her willful compliance. In any event, appellant argues that he did not complete a carjacking because he was ultimately unsuccessful in taking the car from Ms. Kleederman's possession. We agree.

In order to establish that a defendant completed a carjacking under the statute, the government must prove that the defendant, *inter alia*, took "immediate actual possession" of another person's motor vehicle. *(John) Allen v. United States*, 697 A.2d 1, 2 (D.C. 1997). The carjacker may but need not physically remove the vehicle from a victim's presence in order to "take" under the statute. *Moorer v. United States*, 868 A.2d 137, 141 (D.C. 2005) ("Carjacking simply requires possession or control . . . of the car. Neither the [carjacking] statute nor the case law requires the government to prove asportation . . . ."). Indeed, we have held that a victim retains "immediate actual possession" as long as the car "is within such a range that the victim could, if not deterred by violence or fear, retain

actual physical control over it." *Winstead v. United States*, 809 A.2d 607, 610 (D.C. 2002) (citation and internal quotation marks omitted). A taking occurs as soon as the carjacker, by force or violence, shifts possession and control from the victim to himself or herself, which may occur "at any point during a continuous course of assaultive conduct, not just at the starting point." *Id.* at 611.

On the facts before us, appellant never took "immediate actual possession" of Ms. Kleederman's car, as necessary to complete a carjacking. Certainly, appellant's presence in the car made Ms. Kleederman nervous and fearful, but he did not threaten Ms. Kleederman or brandish any kind of weapon, and Ms. Kleederman willfully followed appellant's instructions while "retain[ing] actual, physical control" over her car throughout. *Contra Winstead, supra*, 809 A.2d at 611 (concluding that a defendant took immediate actual possession when he ordered the victim at gunpoint to enter her nearby car and drive against her will). Though appellant later tried to push and pull Ms. Kleederman out of her car, his use of force and violence, in itself, is not sufficient to establish "immediate actual possession" because Ms. Kleederman remained in the driver seat, retained possession of her keys, and never relinquished her possession and control. *See Moorer, supra*, 868 A.2d at 141. Appellant's attempts were ultimately thwarted by Mr. Muslim and Mr. Daniels, prompting appellant to give up and flee. Put simply,

we hold that the evidence in the record is insufficient to show that appellant actually took the car, as required to support a conviction for completed carjacking under D.C. Code § 22-2803 (a)(1), but rather supports an attempted carjacking. We must now turn to the question of whether the carjacking statute under which appellant was convicted encompasses attempted carjacking, such that appellant may be sentenced under the guidelines for the completed offense.

### 2. *Whether the carjacking statute encompasses attempted unarmed carjacking*

Appellant argues that the plain language of § 22-2803 (a)(1) does not proscribe attempted unarmed carjacking and that nothing in the legislative history of the statute demonstrates that the Council of the District of Columbia ("Council") intended to punish an attempted unarmed carjacking as harshly as a completed unarmed carjacking. [7]  Rather, appellant suggests that attempted unarmed

---

[7] Appellant further argues that the backdrop of well-established legal norms undergirding the legislation drafted by the Council militates against punishing attempted crimes equal to completed crimes. *See, e.g.*, *Solem v. Helm*, 463 U.S. 277, 293 (1983) (citing 4 WILLIAM BLACKSTONE, COMMENTARIES *15 (1769)) ("It . . . is generally recognized that attempts are less serious than completed crimes.")

carjacking falls under our general attempt statute, D.C. Code § 22-1803,[8] and that

it was error to convict him under the carjacking statute.

As a preliminary matter, we have parsed the elements of the carjacking

statute in the context of merger analysis on several occasions and observed that the

definition of unarmed carjacking includes attempted carjacking.[9]  However, none

---

[8]  At the time of the events at issue, D.C. Code § 22-1803 provided:

> Whoever shall attempt to commit any crime, which attempt is not otherwise made punishable by chapter 19 of An Act to establish a code of law for the District of Columbia, approved March 3, 1901 (31 Stat. 1321), shall be punished by a fine not exceeding $1,000 or by imprisonment for not more than 180 days, or both. Except, whoever shall attempt to commit a crime of violence as defined in § 23-1331 shall be punished by a fine not exceeding $5,000 or by imprisonment for not more than 5 years, or both.

[9]  *See Pixley v. United States*, 692 A.2d 438, 440 (D.C. 1997) (quoting the full text of the unarmed carjacking statute to complete a merger analysis of carjacking and robbery, stating:  "we observe that carjacking by definition includes an "attempt [ ]" to take property, while robbery does not"); *Allen, supra*, 697 A.2d at 2 (quoting the full text of the unarmed carjacking statute to complete a merger analysis of carjacking and unauthorized use of a motor vehicle, stating: "In order to establish a violation of the carjacking statute, the prosecution must prove beyond a reasonable doubt that the defendant 1) knowingly or recklessly; 2) by force or violence; 3) took from another person; 4) immediate actual possession; 5) of a person's vehicle; or 6) attempted to do so"); *see also Moorer, supra*, 868 A.2d at 141 & n.9 (citing *Pixley, supra*, 692 A.2d at 440, and *Allen, supra*, 697 A.2d at 2) (comparing the elements of carjacking and the offense of taking property without right ("TPWR") to conclude, after an analysis similar to merger analysis, that the

(continued . . .)

of these prior decisions have addressed the question of whether the language of the carjacking statute proscribes attempted unarmed carjacking, and we conclude that, in these prior decisions, "the judicial mind was not asked to focus upon, and the opinion did not address, the point at issue[.]" *Bishop v. United States*, 983 A.2d 1029, 1038 (D.C. 2009) (citation and internal quotation marks omitted) (declining to treat as binding a prior decision applying a particular standard because the prior decision provided no reasoning or authority and the standard was not essential to the prior decision). Accordingly, our prior decisions are not binding on this court with regard to this question of statutory construction. *Id.* (quoting *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971)).

"We review issues of statutory construction *de novo*[,]" recognizing that our task is to "discern, and give effect to, the legislature's intent." *Wynn v. United States*, 48 A.3d 181, 188 (D.C. 2012) (citations omitted). Our "primary and

---

(. . . continued)

latter is not a lesser included offense of the former, stating: "Carjacking simply requires possession or control (or attempted possession or control) of the car" and "carjacking by definition includes an attempt, whereas TPWR does not"); *Sutton v. United States*, 988 A.2d 478, 482 (D.C. 2010) (quoting D.C. Code § 22-2803 (a)(1)) (stating that a carjacking occurs when one "[1] 'knowingly or recklessly' [2] uses 'force or violence' to [3] 'take from another person immediate actual possession of [4] a person's motor vehicle,' or when someone 'attempts to do so'" in the context of a sufficiency challenge in which the court interpreted the second and third elements of carjacking, as listed) (brackets in original).

general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he [or she] has used." *Id.* (quoting *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc)). Yet we will not "make a fetish out of plain meaning nor should we make a fortress out of the dictionary." *Whitfield v. United States*, 99 A.3d 650, 656 (D.C. 2014) (citations, internal quotation marks, and brackets omitted). We recognize that each word of a statute "may or may not extend to the outer limits of its definitional possibilities[,]" and that "[t]he meaning — or ambiguity — of certain words or phrases may only become evident when placed in context." *Wynn, supra*, 48 A.3d at 188 (citations and internal quotation marks omitted). We must, therefore, seek to give these words a "sensible construction," *Clyburn v. United States*, 48 A.3d 147, 151 (D.C. 2012) (citation omitted), and, in so doing, we may look beyond the plain language of a statute "where there are persuasive reasons for doing so," such as to "reveal ambiguities that the court must resolve[,]" to avoid "absurd results," to avoid "obvious injustice[,]" or to "effectuate the legislative purpose[.]" *Peoples Drug Stores, Inc., supra*, 470 A.2d at 754-55 (citations and internal quotation marks omitted).

Where a criminal statute remains ambiguous after applying these Cannons of statutory interpretation, however, "it is well-established that [such] statutes should

be strictly construed and that ambiguities should be resolved in favor of the defendant (i.e., the Rule of Lenity)." *Whitfield, supra*, 99 A.3d at 656 (citation and internal quotation marks omitted). "To be sure, the rule of lenity is a secondary Cannon of construction, and is to be invoked only where the statutory language, structure, purpose[,] and history leave the intent of the legislature in genuine doubt." *Id.* (citation omitted).

At the time of the events at issue, D.C. Code § 22-2803 (a)(1) proscribed unarmed carjacking as follows:[10]

> A person commits the offense of carjacking if, by any means, that person knowingly or recklessly by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, *or attempts to do so*, shall take from another person immediate actual possession of a person's motor vehicle.[11]

---

[10] In the time since the events at issue, the language defining carjacking and its armed variant has remained unchanged. The Council amended the statute's sentencing guidelines in subsections (a)(2) and (b)(2) in the statute's present version, enacted June 11, 2013.

[11] The statute goes on to provide sentencing guidelines and define the offense of armed carjacking:

> (a)(2) A person convicted of carjacking shall be fined not more than $5,000 and be imprisoned for a mandatory-minimum term of not less than 7 years and a maximum term of not more than 21 years, or both.

(continued . . .)

(emphasis added).  Our analysis centers on the phrase "or attempts to do so."  A straightforward, grammatically sound reading of this language suggests that the Council intended the phrase to modify the preceding means of taking, rather than the subsequent words, "shall take."  *See Peoples Drug Stores, Inc., supra*, 470 A.2d at 753 (citations and internal quotation marks omitted) ("[I]n examining the

---

(. . . continued)

> (b)(1) A person commits the offense of armed carjacking if that person, while armed with or having readily available any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon (including a sawed-off shotgun, shotgun, machine gun, rifle, dirk, bowie knife, butcher knife, switch-blade knife, razor, blackjack, billy, or metallic or other false knuckles), commits or attempts to commit the offense of carjacking.
>
> (2) A person convicted of armed carjacking shall be fined not more than $10,000 and be imprisoned for a mandatory-minimum term of not less than 15 years and a maximum term of not more than 40 years, or both. However, the court may impose a prison sentence in excess of 30 years only in accordance with § 24-403.01(b-2). For purposes of imprisonment following revocation of release authorized by § 24-403.01(b)(7), armed carjacking is a Class A felony.
>
> (c) Notwithstanding any other provision of law, a person convicted of carjacking shall not be released from prison prior to the expiration of 7 years from the date of the commencement of the sentence, and a person convicted of armed carjacking shall not be released from prison prior to the expiration of 15 years from the date of the commencement of the sentence.

D.C. Code § 22-2803.

statutory language, it is axiomatic that [the] words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them."). Under this reading, which appellant endorses, the statute would seem to proscribe attempts to use "force or violence," attempts to act "against resistance," attempts to "sudden[ly] or stealthy seiz[e]," attempts to "snatch[]," or attempts to "put[] in fear[,]" but not attempts to take. Yet our decisions have also interpreted this phrase to refer to the subsequent language, "shall take."[12] Under this reading, which the government endorses, the statute would seem to proscribe attempts to take.

The ambiguity mostly stems from the wording and position in the sentence of the phrase "or attempts to do so." As to its wording, the use of "or" suggests that the phrase refers backward to modify the means of taking. As to its position in the sentence, placing the phrase "or attempts to do so" before the verb "take" does not obviously suggest that the phrase modifies the verb. What is more, even if we switch the order of the phrase and the verb when reading the statute, the result is grammatically incorrect: "A person commits the offense of carjacking if, by any means, that person . . . [shall take] or attempts to do so[.]" A grammatically correct phrase modifying the singular noun "person" would read "shall take or

---

[12] See *supra* note 9.

attempt to do so." We find this ambiguity particularly puzzling, given that the Council, when drafting statutes that proscribe attempted and completed acts, seems to follow a linguistic pattern of using the phrase "[act], or attempt/s to [act]."[13] In fact, the carjacking statute itself follows this linguistic pattern when proscribing attempted and completed *armed* carjacking. *See* D.C. Code § 22-2803 (b)(1) ("commits or attempts to commit"). In short, however one reads the statute, the placement of the phrase "or attempts to do so" creates ambiguity as to whether the statute refers to attempts to effectuate the means of carjacking that actually result in a completed carjacking, or attempts to "take" that fail, and result in an attempted carjacking.

The ambiguity remains when reading the unarmed carjacking subsection of the statute together with the armed carjacking subsection. *See* D.C. Code § 22-2803 (a)(1) (stating that a person commits unarmed carjacking "if, by any means, that person . . . shall take from another person immediate actual possession of a person's motor vehicle"); D.C. Code § 22-2803 (b)(1) (stating that a person

---

[13] Appellant points to ten statutes to suggest that the Council favors a particular formulation when including "attempt" language in a statute that also proscribes a completed act, including the arson statute, *see* D.C. Code § 22-301 (2013 Supp.) ("burn or attempt to burn"), the escape statute, *see* D.C. Code § 22-2601 (2013 Supp.) ("escape or attempt to escape"), and the unauthorized use of official insignia statute, *see* D.C. Code § 22-1409 (b) (2013 Supp.) ("makes or attempts to make unauthorized use of").

commits armed carjacking "if that person, while armed . . . commits or attempts to commit the offense of carjacking."). One might reasonably conclude that the Council, in drafting these subsections as such, intended to treat unarmed and armed carjacking differently — namely, by proscribing unarmed carjacking only when completed, and proscribing armed carjacking whether attempted or completed. If this were so, a person who commits an attempted unarmed carjacking could not be convicted under the carjacking statute, but would instead fall within the ambit of the general attempt statute, D.C. Code § 22-1803 (proscribing attempts to commit any crime not otherwise punishable under the D.C. Code).[14]

On the other hand, a less obvious yet still reasonable reading of the same subsections could lead one to conclude that the armed carjacking subsection's "commits or attempts to commit" language implies a similar interpretation for the unarmed carjacking subsection, such that the carjacking statute proscribes attempted and completed carjacking, whether unarmed or armed. Yet this conclusion begs a question: if the Council intended this meaning, why use different language? In the absence of statutory language that clearly conveys the Council's intent, we turn for guidance to the legislative history of the statute. *See Whitfield, supra*, 99 A.3d at 656.

---

[14] See *supra* note 8.

The Council introduced carjacking as a separate offense in the District of Columbia as part of a bill entitled "Carjacking Prevention and Bail Reform Amendment Act of 1992 Temporary Amendment Act of 1992," seeking to address a surge in carjackings in the District of Columbia. *See* D.C. Bill 9-629, § 2 (Sept. 18, 1992) (hereinafter "draft version"); *see also* Council of D.C., Comm. on the Judiciary, Comm. Rep. on Bill 10-16, "Carjacking Prevention Amendment Act of 1993," at 2 (Feb. 10, 1993) (hereinafter "committee report"). Noticeably absent from the draft version of the statute is the "attempts to do so" language at issue here. Noticeably present, however, are separate sentencing guidelines for attempted carjacking. The draft version provided:

> (a) A person commits the offense of carjacking if by any means, that person knowingly or recklessly by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person immediate actual possession of a person's motor vehicle.
>
> (b) A person convicted of carjacking shall be fined not more than $10,000 or be imprisoned for a mandatory minimum term of not less that [sic] 15 years or both.
>
> (c) A person convicted of attempted carjacking shall be fined not more than $1,000 or be imprisoned for not more than 3 years, or both.

D.C. Bill 9-629, § 2 (Sept. 18, 1992).

The present language of the carjacking statute first appeared in an October 6, 1992, amendment to this draft version. *See* Amendment No. 6 to D.C. Bill 9-629, Attachment 2 (October 6, 1992) (hereinafter "amendment"). This amendment added, *inter alia*, the phrase "or attempts to do so" after the phrase "putting in fear" and removed the separate three-year mandatory maximum sentence for attempted carjacking in subsection (c). *Id.*[15] The Council did not indicate why it amended the draft bill in this way. On the one hand, we might conclude that the Council removed the three-year mandatory maximum sentence for attempted carjacking in subsection (c) in order to punish attempted carjacking under the general attempt statute, which, at the time, set the mandatory maximum sentence for attempt at one year. *See* D.C. Code § 22-1803 (1981). Decreasing the maximum sentence for attempted carjacking from three years to one year would complement the Council's contemporaneous decision to reduce the mandatory minimum sentence for unarmed carjacking from fifteen years to seven years. *Compare* D.C. Bill 9-629, § 2 (Sept. 18, 1992), *with* Amendment No. 6 to D.C. Bill 9-629, Attachment 2 (October 6, 1992). On the other hand, removing this separate sentencing guideline for attempted carjacking from the draft bill may merely indicate that the Council

---

[15] In the years since, the language of the carjacking statute has remained unchanged, with the exception of modifications to the sentencing guideline provisions in (a)(2) and (b)(2), and the addition of a new subsection (c), also related to sentencing. See *supra* note 11.

considered punishing attempted carjacking less severely but ultimately decided not to do so, and preserved this decision by adding the phrase "or attempts to do so" to the final carjacking statute.

The committee report accompanying the final version of the carjacking statute is silent on any intent to punish attempted carjacking and completed carjacking equally, and the word "attempt" does not appear in the report. *See* Council of D.C., Comm. on the Judiciary, Comm. Rep. on Bill 10-16, "Carjacking Prevention Amendment Act of 1993" (Feb. 10, 1993).[16] The report explains that the Council created a separate offense of carjacking to increase the minimum penalty for the crime, which was classified as robbery at the time and punishable under the District's since-modified robbery statute, D.C. Code 22-2901 (1981).[17]

---

[16] The committee report explains that carjacking had become a "growth industry" in 1992, and that a nationwide surge in carjacking prompted Congress to make it a federal crime. *See* Council of D.C., Comm. on the Judiciary, Comm. Rep. on Bill 10-16, "Carjacking Prevention Amendment Act of 1993," at 2 (Feb. 10, 1993). In particular, the Council mentioned the gruesome carjacking-homicide of Pamela Basu that drew national attention, and stated that the District was not immune from this nationwide surge. *Id.* at 2-3. The Council also noted that District residents were particularly impacted by the surge in carjackings because the District is a "city of renters," for whom a car is likely the most valuable possession. *Id.* Thus, the Council thought it necessary to create the separate offense of carjacking with an increased minimum penalty, up from the two year minimum that a carjacker would have received under the robbery statute. *Id.* at 3.

[17] The robbery statute, D.C. Code § 22-2901 (1981), provides:

(continued . . .)

*Id.* at 3. The Council did not indicate, however, whether it intended the District's carjacking statute to follow the model of its robbery statute, which does not proscribe attempted robbery. Nor did the Council indicate that it intended the District's carjacking statute to follow the model of the federal carjacking statute, which proscribes attempted and completed carjacking, but provides sentencing guidelines based on the victim's degree of injury or death, rather than whether the suspect was armed or unarmed.[18]

_____

(. . . continued)

> Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery, and any person convicted thereof shall suffer imprisonment for not less than 2 years nor more than 15 years.

[18] The federal carjacking statute, 18 U.S.C. § 2119 (1996), enacted just before the District's statute as part of the Anti Car Theft Act of 1992, Pub. L. No. 102-519, 106 Stat 3384, and mentioned in the committee report, includes a similar "or attempts to do so" phrase that, unlike the District's statute, unambiguously follows the verb "takes." The federal carjacking statute provides:

> Whoever, with the intent to cause death or serious bodily harm *takes* a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, *or attempts to do so*, shall—

> (1) be fined under this title or imprisoned not more than 15 years, or both,

(continued . . .)

In the absence of any clear intent behind the Council's amendments and eventual choice of language, we cannot conclude whether it drafted the statute to encompass or exclude attempted unarmed carjacking. We perceive no clear intent with regard to attempted carjacking in the legislative history, nor can we identify any well-founded support for the many inferences that the parties suggested in their arguments. Granted, the legislative history seems to indicate that the Council was not satisfied by proscribing *only* completed carjackings, yet the Council expressed no legislative intent to punish attempted and completed carjacking *equally*.[19]

We conclude that the subsection of the carjacking statute proscribing unarmed carjacking, § 22-2803 (a)(1), is ambiguous as to whether it also proscribes attempted unarmed carjacking. While it is plausible, with some effort,

_____

(. . . continued)

> (2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and

> (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

(emphasis added).

[19] See *supra* note 16.

to construe the plain language of the statute as proscribing attempts to "take," it is at least equally plausible to construe this language as proscribing attempts to "put[] in fear," among other means of effectuating a completed carjacking. The actual meaning intended by the Council is unclear. Because we are unable to a resolve this evident ambiguity, "we construe [the statute] in conformance with the rule of lenity[,]" and rule in appellant's favor. *Whitfield, supra*, 99 A.3d at 664 ("We apply the rule of lenity . . . where the language of the regulation is ambiguous and two alternative interpretations are equally possible."). The Council is, of course, at liberty to revise the statute to punish attempted carjacking as a lesser or equal offense to completed carjacking. In the interim, however, we hold that attempted unarmed carjacking is punishable under our general attempt statute, § 22-1803,[20]

---

[20] See *supra* note 8. In order to prove an attempt to commit any offense, "the government must prove that the accused: (1) intended to commit that particular crime; (2) did some act towards its commission; and (3) and failed to consummate its commission." *Frye v. United States*, 926 A.2d 1085, 1096 (D.C. 2005). We have adopted the "dangerous proximity" theory of attempt, whereby:

> An attempt consists of an act which is done with the intent to commit a particular crime and is reasonably adapted to the accomplishment of that end. The act must go beyond mere preparation and must carry the criminal venture forward to within dangerous proximity of the criminal end sought to be attained.

> This "dangerous proximity" test, formulated by Justice Holmes, does not require that appellants have commenced the last act sufficient to produce the crime

(continued . . .)

and is not punishable under the carjacking statute, § 22-2803 (a)(1). Accordingly, we vacate appellant's conviction for the carjacking of Ms. Kleederman and remand for resentencing for attempted carjacking in accordance with this holding.

### B. Appellant's Abuse of Discretion Arguments

#### 1. The government's statements regarding appellant's right to independent DNA testing under Teoume-Lessane

Appellant next argues that the trial judge abused his discretion and impermissibly shifted the burden of proof to appellant by allowing the government to mention at trial that appellant has the right to conduct independent DNA testing under the Innocence Protection Act.[21] We have held that the government may

_____

(. . . continued)
> but focuses instead on the proximity of appellants'
> behavior to the crime intended.

*Jones v. United States*, 386 A.2d 308, 312 (D.C. 1978) (footnote omitted). "[M]ere preparation is not an attempt, but preparation may progress to the point of attempt. Whether it has is a question of degree which can only be resolved on the basis of the facts in each individual case." *Id.* at 313 n.2. It is sufficient for the government to prove that "except for some interference," defendant's "overt act done with the intent to commit a crime . . . would have resulted in the commission of the crime." *Evans v. United States*, 779 A.2d 891, 894 (D.C. 2001).

[21] D.C. Code §§ 22-4131 to -4135 (2012 Repl.)

inform the jury of a defendant's right to independent DNA testing to rebut defendant's suggestion that the government's procedures are biased. *See Teoume-Lessane, supra*, 931 A.2d at 491 ("[T]he defense's questions had attempted to create the impression that the FBI's testing had been selectively performed to skew the results by focusing only on the items most damaging to appellant, while ignoring items that could have helped to exculpate him."). Appellant argues that he did not make a bias argument at trial, but merely questioned the reliability of DNA testing by challenging "the validity of the underlying methods and assumptions," an argument that does not open the same door as questions about bias under *Teoume-Lessane*. Appellant argues that by allowing evidence of a defendant's right to independent DNA testing when there was no unfairly prejudicial inference to counter, the trial court allowed the jury to infer that he had failed to present independent DNA testing evidence because it would have confirmed his guilt. We agree, yet we conclude that any error on the trial court's part was harmless.

At trial, the government relied on *Teoume-Lessane* to move *in limine* for leave to elicit testimony from its DNA-testing expert regarding appellant's right to independent DNA testing because it anticipated that defense counsel would attack "the specific methods or probabilities used or recommended by the expert in this

case." In support of this motion, the government argued that *Teoume-Lessane* permits it to point out a defendant's right to independent DNA testing if the defense "suggests that the government erred in its random match probability" or attacks "a laboratory's protocols, the analysis performed by the DNA expert, or the type or extent of that analysis." Defense counsel responded that *Teoume-Lessane's* holding is narrowly restricted to suggestions of bias, which were not part of defense counsel's strategy in this case. The trial judge ruled in the government's favor, stating that the "government has a right to respond" to an argument from defense counsel "that the protocols used by this tester were likely to result in an unreliable identification." Disagreeing with defense counsel's narrow reading of *Teoume-Lessane*, the trial judge stated "[w]ell, I [may] have misread it. But that's my ruling. I'm not going to require the government to sit silent while the reliability of their procedures is challenged." Subsequently, during cross-examination of the government's DNA expert, the trial court concluded that defense counsel opened the door under *Teoume-Lessane*. The parties agreed to stipulate to a defendant's right to conduct independent DNA testing, and the trial judge read this stipulation to the jury, along with a reminder that the government bears the burden of proof. Later, the government reminded the jury of the defendant's right to conduct independent DNA testing in rebuttal to defense counsel's cross-examination of its DNA expert. Upon defense counsel's objection,

the trial judge issued a curative instruction reminding the jury that "this is a sensitive area of the law" and "it is the Government's burden to prove its case beyond a reasonable doubt."

We review a trial court's decision to admit evidence, and its determination that the evidence is more probative than prejudicial, for abuse of discretion. *See id.* at 491 (citations omitted). In *Teoume-Lessane*, and later in *Gee v. United States*, 54 A.3d 1249, 1255-58 (D.C. 2012), this court narrowly held that the door opens to an independent-DNA-testing rebuttal when defense counsel suggests that the government used biased procedures or withheld evidence in order to obtain a conviction. *See Teoume-Lessane, supra*, 931 A.2d at 491 ("[D]efense's questions had attempted to create the impression that the FBI's testing had been selectively performed to skew the results by focusing only on the items most damaging to appellant, while ignoring items that could have helped to exculpate him."); *Gee, supra*, 54 A.3d at 1255-57 (applying *Teoume-Lessane* to conclude that defense counsel unfairly suggested to the jury "that the Government was only testing that which they found a positive test and ignored other[] [portions of a piece of clothing] that presumably might have been tested and could have exculpated your client[,]" thereby "creating the impression that the government had deliberately ignored, and then had withheld from the defense, evidence that could have called

into question the government's DNA-based case"). Thus, our inquiry must focus on defense counsel's statements at trial that the government contends amount to accusations of bias, thereby opening the door under *Teoume-Lessane*.

The government does not point to a specific statement from defense counsel that suggests biased procedures, nor did we find one in our review, but the government instead suggests that defense counsel implied bias through a recurring theme of "attack[ing] the priorities of the FBI examiners and their attentiveness to their work" and suggesting "laziness and sloppiness." Specifically, during the government's case, defense counsel cross-examined its DNA expert and seven lab technicians and established that the DNA analysis took several years and that some of the initial analysts had taken fewer notes to document their work than some of the later analysts. Defense counsel also sought to establish that the FBI's protocols for determining the probability of a DNA match relied on too little DNA and too small a population group to be reliable, citing a study conducted in Arizona. On redirect, the government rehabilitated its DNA expert by eliciting an explanation of the FBI's testing approach. In closing argument, defense counsel characterized "the basic science, the principles that DNA analysis is founded upon" as "flawed." Defense counsel also noted that the government's DNA expert "told you that this was a low priority case. But, that's a reason to doubt. It is low priority for her.

But it's not low priority for [appellant]."  Finally, defense counsel used an analogy of the pitfalls of failing to show work in an algebra class to suggest similar pitfalls when FBI technicians "d[o] not document anything" and do not "show [their] work."

Here, the trial court, citing *Teoume-Lessane*, stated that "[t]he government has a right to respond" with an independent-DNA-testing rebuttal when defense counsel argues that "the protocols used by this tester were likely to result in an unreliable identification of your client."  *Teoume-Lessane* is clear:  suggestions of bias open the door.  *See Teoume-Lessane, supra*, 931 A.2d at 491.  There is a distinction between a bias attack and an attack on the competence of an expert or the validity of protocols.  Biased methods carry a degree of intentionality that incompetence and unreliability do not.  Defense counsel's suggestion during closing arguments that this was a "low priority" case and that technicians did not "show their work" are charges of incompetence and unreliability, not bias.  We have not applied *Teoume-Lessane* to competence and reliability challenges, and we decline to do so here.

Accordingly, the trial court erred by construing the holding of *Teoume-Lessane* to permit the government to offer an independent-DNA-testing rebuttal

when defense counsel fervently challenged the competence of DNA testing personnel and the reliability of testing methods. Contrary to the trial judge's statement, the government is not required to "sit silent" when facing this challenge, but is permitted to — and, in the present case, did — rehabilitate its witness through redirect examination or additional testimony on the competence of personnel and the reliability of the challenged procedures.

Yet we also conclude that permitting the government to inform the jury of appellant's right to independent DNA testing in this case was harmless error. *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946). The trial court was careful to explain that appellant's right did not alter the government's burden of proof, and this instruction was sufficient to mitigate the harm on the facts before us, where there was ample circumstantial evidence tying appellant to the Kleederman carjacking. *See (Claude) Allen v. United States*, 603 A.2d 1219, 1224 (D.C. 1992 (en banc) ("[O]ne would presume that the jury applied the law as stated by the judge, not by the prosecutor"). Given this DNA evidence, there is no indication that, had the trial court not erred in permitting an independent-DNA-testing rebuttal, defense counsel's arguments regarding the FBI's protocols would have convinced the jury to find in appellant's favor.

## 2. *Jury instructions regarding scientific research on the reliability of eyewitness identification*

In appellant's only claim on appeal related to the Cannon carjacking, he argues that the trial court abused its discretion by rejecting a proposed jury instruction incorporating recent scientific research regarding eyewitness identification because the trial court "erroneously believed" that it "could not instruct the jury based on scientific research." Appellant argues that this research was particularly relevant because Ms. Cannon's in-court identification provided the pivotal link between the two incidents.[22]

At trial, appellant's defense counsel proposed jury instructions on eyewitness reliability based on instructions that the state of New Jersey recently adopted at the suggestion of the Supreme Court of New Jersey in *State v. Henderson*, 27 A.3d 872, 884, 916-17, 919, 925-26 (N.J. 2011) (concluding, based on expert testimony and a special master's report examining scientific studies on memory and eyewitness identification, that "science abundantly demonstrates the many vagaries of memory encoding, storage, and retrieval; the malleability of

---

[22] Appellant contends that the District of Columbia's model jury instructions for eyewitness identification rely on authority that is over forty years old and "give[s] the jury no guidance on how to evaluate an eyewitness's confidence" in making an identification.

memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications").[23] The defense counsel's proposed instructions cited to *Henderson* and several other cases in footnotes without any explanation or citation to the scientific studies cited in those cases. Instead, the instructions referred generally to the results of those studies, using phrases such as "research has shown that there are risks of making mistaken identifications" and "research has revealed that human memory is not like a video recording . . . ."

In rejecting defense counsel's proposed instruction, the trial court explained to the parties that "the problem with the instruction . . . is that it talks about the research. There is no evidence of research that is before the jury. I don't think that it's appropriate for me to be talking about what the research is on this issue." Defense counsel proceeded to explain that "the research exists" and is "well

---

[23] The District of Columbia's Jury Instructions Committee acknowledged the *Henderson* decision and recent social science studies on eyewitness identification in a comment to its 2013 revision. *See* Criminal Jury Instructions for the District of Columbia ("Red Book"), No. 9.210 (5th ed. rev. 2013). It noted, however, that "[t]he Committee is not in agreement over whether, and under what circumstances, additional instruction is necessary that would warn a jury to take care in appraising identification testimony." *Id.* This comment was not included in the 2012 revision that was available to the trial judge in the present case.

established," and the trial court responded: "I'm comfortable with the Red Book [i]nstruction. I believe that that sets forth the appropriate considerations for the jury to take into account in assessing the strength and reliability of Ms. Cannon's identification." Defense counsel noted her objection for the record, and the trial judge elaborated:

> Well I think that that area is an area that could come before the jury in the form of evidence and it could be rebutted by the government by contrary studies.[24] But, I don't think that it's appropriate to just instruct the jury as to what the research has found in this evolving area of law. It would be up to them to evaluate the research if it was put before them. But, it does not appear that it will be put before them in this case. So, I will stick with the Red Book.

The trial judge issued the following jury instruction based on the model instruction in the Red Book, Criminal Jury Instructions for the District of Columbia, No. 9.210 (5th ed. rev. 2012):

---

[24] Appellant contends that he did not offer an expert on eyewitness identification at trial because defense counsel only learned that Ms. Cannon would identify appellant in court the day before it happened, in an email from the government. Prior to receiving the government's email, appellant contends, hiring an expert in the off-chance that a witness would end up identifying appellant would have wasted public funds and, accordingly, "jury instructions were the only practicable means of educating the jury." However, defense counsel filed a general motion to suppress any potential in-court identifications at the start of trial and could have opted to acquire an expert.

A number of factors may affect the reliability of an identification of the defendant by an alleged eyewitness including the witness' opportunity to observe the criminal acts and the person committing them including but not limited to the length of the encounter; the distance between the various parties; the lighting conditions at the time; the witness' state of mind at the time of the offense.

Secondly, any subsequent identification and the circumstances surrounding that identification including the length of time that elapsed between the crime and the identification; the witness' state of mind when making the identification and any statements or actions by law enforcement officers concerning the identification.

Third, any failure of a witness to make an identification or a misidentification by the witness and any other factors that may have been brought to your attention by expert testimony and the remaining evidence that you conclude bear upon the reliability of the witness' in-Court or out of Court identification of the defendant.

The trial court has "broad discretion in formulating jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *Fearwell v. United States*, 886 A.2d 95, 101 (D.C. 2005) (citation and internal quotation marks omitted). "[A] party is entitled to a requested instruction only if there is evidence in the record to support the request." *Id.* (citation omitted). The trial court must make "an informed choice among permissible alternatives . . . based upon and drawn from a firm factual

foundation[,]" and thus abuses its discretion by fashioning jury instructions that are not so drawn. *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C. 1997) (citation omitted).

Appellant concedes that the trial court was not "required as a matter of law" to adopt the proposed instruction. Indeed, the parties did not introduce any expert testimony or scientific studies regarding eyewitness identification, and defense counsel was not entitled to an instruction that the record could not support. *See Fearwell, supra*, 886 A.2d at 101 (explaining that a party is "only" entitled to a requested instruction if the record will support it). Yet appellant contends that the trial court's statements indicate that it premised its decision to reject defense counsel's proposed jury instructions on a legally erroneous belief that it *could not* consider the proposed scientific research, rather than a discretionary decision that it *would not* do so. *See Johnson v. United States*, 398 A.2d 354, 367 (D.C. 1979) (holding that reversal is required where the trial court fails to recognize its capacity to exercise discretion). We disagree.

In our view, the trial court's choice of language provides no indication that it considered itself constrained to reject the scientific research outright. The trial court did not say that it was "precluded" or "prohibited," or that "case law clearly

requires exclusion" of such scientific research. Rather, after hearing defense counsel's arguments, the trial court concluded that it would not be "appropriate" to instruct the jury about research on eyewitness identification that the parties had not presented to the jury. In choosing to "stick with the Red Book" instructions, the trial court recognized that the proposed instruction differed, in that it extensively referenced research in an "evolving area of law" that was not before the jury, and this difference provided reasonable cause for concern. *See Johnson, supra*, 398 A.2d at 364 ("[T]he determinations committed to the trial court's discretion are rational acts of decision-making. An informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation."). The trial court's statement that this research "could come before the jury in the form of evidence and it could be rebutted by the government by contrary studies" expresses a clear discretionary preference for the adversary process and constitutes a thoughtful exercise of discretion. This record does not support appellant's contention that the trial judge was under the legally erroneous view that he was precluded from using the proposed instruction.[25]

---

[25] Notably, the language that defense counsel adopted from the *Henderson* decision was the result of just such an adversarial process. In that case, the government, defense counsel, and amici curiae "collectively produced more than 360 exhibits, which included more than 200 published scientific studies on human memory and eyewitness identification" and "testimony from seven expert witnesses." *See Henderson, supra*, 27 A.3d at 829. On the basis of this evidence,

(continued . . .)

### III. Conclusion

Accordingly, we affirm appellant's convictions with regard to all but the carjacking of Ms. Kleederman because the evidence in the record is insufficient to establish that appellant completed this carjacking. We therefore vacate this conviction and remand for resentencing for attempted carjacking in accordance with our holding.

*So ordered.*

------

(. . . continued)

the court stated that "the record proves that the possibility of mistaken identification is real[,]" and accordingly proposed revised jury instructions. *Id.* at 878.

Appellant contends that the *Henderson* case and the studies cited therein are legislative facts appropriate for judicial notice, citing *Jones v. United States*, 548 A.2d 35, 42, 45 (D.C. 1988), where we assessed the reliability of a drug testing method. In *Jones*, we held that the trial court may, in the absence of expert testimony in the record, take judicial notice of other court opinions and scientific literature for the limited purpose of establishing "general acceptance of a scientific technique[,]" and that, to this end, "[e]xpert testimony in other cases, subject to cross-examination, can be probative[.]" *Id.* at 42, 45. The trial court exercised its discretion to reject the jury instructions, and there is nothing in the record that leads us to conclude that the trial court was unaware of or misinformed about our case law.