*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-CF-0344

EMANUEL LEYTON PICON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CF3-004336)

(Hon. Robert D. Okun, Trial Judge)

(Argued June 5, 2025                    Decided September 4, 2025)

*Matthew B. Kaplan* for appellant.

*Eric Hansford*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *John P. Mannarino*, *Alec Levy*, and *Randle Wilson*, Assistant United States Attorneys, for appellee.

*Alice Wang*, with whom *Jaclyn S. Frankfurt* was on the brief, for Public Defender Service as *amicus curiae*.

*Caroline S. Van Zile*, Solicitor General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Thais-Lyn Trayer*, Deputy Solicitor General, and *Tessa Gellerson*, Assistant Attorney General, were on the brief, for intervenor-appellee the District of Columbia.

Before BLACKBURNE-RIGSBY, *Chief Judge*, SHANKER, *Associate Judge*, and EPSTEIN,[*] *Senior Judge, Superior Court of the District of Columbia.*

SHANKER, *Associate Judge*: A jury convicted appellant Emanuel Leyton Picon of multiple offenses in connection with a shooting outside of a District of Columbia nightclub in July 2021: one count each of aggravated assault while armed, assault with a dangerous weapon, assault with significant bodily injury while armed, carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition, and three counts of possession of a firearm during a crime of violence.  Mr. Leyton appeals those convictions on two grounds.[1]

First, Mr. Leyton contends that we must vacate his convictions for carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition on the ground that the District's statutes requiring that an applicant be at least twenty-one years old to obtain a firearm registration or license violate the Second Amendment to the United States Constitution.  We hold that the District's age-based firearm registration and licensing statutes are constitutional

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a).

[1] Mr. Leyton also asserts that his convictions for assault with a dangerous weapon and assault with significant bodily injury while armed merge with his conviction for aggravated assault while armed, and his three convictions for possession of a firearm during a crime of violence merge.  The government agrees, as do we.

because they are consistent with our Nation's historical tradition of firearm regulation.

Second, Mr. Leyton argues that the government made improper arguments regarding the inconsistency between his out-of-court statement to police that he did not shoot the complainant and his in-court testimony—delivered after the government had presented its evidence—that he shot the complainant in self-defense. We conclude that the government's arguments were not improper.

Accordingly, we affirm Mr. Leyton's convictions and remand for the limited purpose of merging Mr. Leyton's convictions and resentencing as necessary.

## I.     Factual and Procedural Background

Following the shooting, Mr. Leyton was charged with multiple offenses. Before trial, he moved to dismiss the charges of carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition, arguing that the District's age-based licensing and registration scheme is unconstitutional under the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).

The District's firearm licensing statute states that "no person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol,

without a license issued pursuant to District of Columbia law." D.C. Code § 22-4504(a). District law further requires that "a person who submits an application" for a license to carry a pistol "shall certify and demonstrate . . . that he or she . . . is at least [twenty-one] years of age." *Id.* § 7-2509.02(a)(1) (citation modified).

The firearm registration statute provides that "no person or organization in the District shall possess or control any firearm, unless the person or organization holds a valid registration certificate for the firearm." *Id.* § 7-2502.01(a). A related provision states that "no registration certificate shall be issued to any person . . . unless . . . such person . . . is [twenty-one] years of age or older." *Id.* § 7-2502.03(a)(1) (citation modified). That provision allows for an "applicant between the ages of [eighteen] and [twenty-one] years old . . . who is otherwise qualified" to be issued a registration certificate if the application is "accompanied by a notarized statement of the applicant's parent or guardian." *Id.* § 7-2502.03(a)(1).

The ammunition registration statute states that "no person shall possess ammunition in the District of Columbia unless . . . he is the holder of a valid registration certificate for a firearm." *Id.* § 7-2506.01(a)(3) (citation modified). As stated above, one must be at least twenty-one years old, or have parental approval,

to be issued a firearm registration certificate and, thus, be able to possess ammunition. *Id.* § 7-2502.03(a)(1).

In his motion to dismiss, Mr. Leyton contended that these age-based restrictions preventing people between eighteen and twenty-one years old from possessing and carrying firearms amount to "a total ban on an entire population of individuals from exercising a core constitutional right."

The government countered that the challenged regulations are constitutional under *Bruen* because the laws are "consistent with this Nation's historical tradition of firearm regulation" where, among other things, eighteen-to-twenty-one-year-olds were not considered legal adults for much of American history. The trial court agreed with the government and denied Mr. Leyton's motion, ruling that the age-based gun restrictions are consistent with the text of the Second Amendment and the Nation's history and tradition of firearm regulation.

The case proceeded to trial, where the evidence established the following. In the early morning hours of July 30, 2021, someone shot Edwin Hernandez in the chest outside a nightclub located on 14th Street NW in the District of Columbia. Police officers stopped and detained Mr. Leyton, then twenty years old, because he matched the description given by a member of the club's security team. The police then took Selvin Amaya, Mr. Hernandez's cousin who had accompanied him to the

club, to the location where they had detained Mr. Leyton. There, Mr. Amaya positively identified Mr. Leyton as the shooter. Officers also discovered a shell casing near the crime scene. After his arrest, Mr. Leyton told police that he did not shoot Mr. Hernandez and that the gunshot came from two cars parked in the nearby vicinity.

The next day, police recovered a black handgun hidden in a flowerpot near the nightclub. A firearm examiner concluded that the shell casing found at the crime scene was consistent with having been fired from that handgun. DNA recovered from the handgun was consistent with Mr. Leyton's DNA. Mr. Leyton had neither a firearm registration nor a license to carry. He had no prior criminal history.

At trial, Mr. Leyton testified in his own defense. He admitted that he "lied" to police officers on the night of the shooting when he said he did not shoot Mr. Hernandez and that the shots came from two cars parked on a nearby street. Mr. Leyton testified to shooting Mr. Hernandez but claimed that he did so in self-defense.

Seizing on Mr. Leyton's inconsistencies, the government sought to impeach his credibility during cross-examination. Through its questioning, the government suggested that on the night of the incident, Mr. Leyton believed that the gun used in the shooting would not be traced to him (given that he had dumped it in a flowerpot).

The government intimated that it was because of this belief that Mr. Leyton told the police that he was not the shooter. The government contended that Mr. Leyton adopted a self-defense strategy only after he learned of the DNA evidence connecting him to the recovered gun and ballistics evidence connecting the gun to the shooting.

Defense counsel objected to this line of questioning, arguing that the only way Mr. Leyton would be able to rebut the assertion that he changed his defense theory after seeing the evidence offered in court would be by divulging privileged attorney-client communications. The trial court ruled that the government could ask Mr. Leyton whether he heard the DNA and ballistics testimony at trial and make further arguments during closing but could not ask additional questions given the objection raised by defense counsel.

During its closing argument, the government recapped its DNA and ballistics evidence and argued to the jury that "only after you heard all that evidence did [Mr. Leyton] tell you, okay, yeah, I'm the shooter." The government characterized the change in Mr. Leyton's defense theory as the following:

> On the scene, when he stashed the gun, when he thinks he's gotten away with it and he fooled police, he says, yeah, I was there, but I just wasn't the shooter. Once the gun is found, once you hear the DNA evidence linking the defendant to the gun, once you hear the ballistics evidence

> linking the gun to the shooting, now it seems that—he
> can't really say he's not the shooter anymore, so how else
> is he going to get out of trouble? His only choice left is
> self-defense, and so that's what he says. Ladies and
> gentlemen, that is—that is too convenient. That is not
> credible.

The jury convicted Mr. Leyton of the firearm offenses. Mr. Leyton timely appealed.

## II.    Analysis

Mr. Leyton contends that (1) the District's age-based firearm registration and licensing statutes are unconstitutional under the Second Amendment as applied to people between the ages of eighteen and twenty-one and (2) the government's argument regarding the inconsistency between his out-of-court statement and in-court testimony requires reversal. We consider each argument in turn. Unpersuaded, we affirm Mr. Leyton's convictions.

### A.    Age-Based Firearm Registration and Licensing Regulations

#### 1.    Legal Standards and Standard of Review

"We review a challenge to the constitutionality of a statute de novo." *District of Columbia v. Towers*, 260 A.3d 690, 693 (D.C. 2021). The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const.

amend. II. "Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*

In *Heller*, the Supreme Court held that the Second Amendment confers an individual right of law-abiding citizens to possess a handgun in the home for self-defense. *Id.* at 635-36. In *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court held that the Fourteenth Amendment applies this right to the States. Then, in *Bruen*, the Court held that such a right applies outside the home as well. 597 U.S. at 17. The Court also articulated a new test for evaluating the constitutionality of firearm restrictions:

> We hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that

the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* (citation modified). The Court set forth a two-part test. First, courts must determine whether a defendant is "part of 'the people' whom the Second Amendment protects" and whether "the plain text of the Second Amendment protects" the defendant's "course of conduct." *Id*. at 31-32. Courts have indicated that the party challenging the regulation bears the burden of proof on this point. *See Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024). Second, if the challenger is entitled to protection under the Second Amendment, the government bears the burden to show that the challenged regulation "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 34. Courts must evaluate whether a "historical tradition of firearm regulation" exists by determining whether a modern firearm regulation has a historical regulation that is a "historical analogue" "relevantly similar" to it. *Id.* at 29-30. "[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check" and "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*" or "dead

ringer." *Id.* at 30 (emphasis in original). The modern regulation need only be "analogous enough to pass constitutional muster." *Id.*

Two years after *Bruen*, the Supreme Court applied the history-and-tradition test in *United States v. Rahimi*, 602 U.S. 680, 691-92 (2024). The Court sought to clarify "misunderst[andings]" that had plagued lower courts, saying that it did not intend to "suggest a law trapped in amber" with its Second Amendment jurisprudence and methodology. *Id.* at 691. The Court stated that a regulation is lawful if it "fits within" and "is consistent with the principles that underpin our regulatory tradition." *Id.* at 691-92.

The inquiry turns on "why and how" the regulation burdens the right to keep and bear arms. *Rahimi*, 602 U.S. at 692 (citation modified). If the challenged regulation addresses the same or similar problems as historical restrictions, then it shares a "why" with those restrictions. *Id.* This shared "why" is a "strong indicator" that modern regulations "fall within a permissible category of regulations." *Id.* If a regulation shares a "why" with historical restrictions, it is lawful if it is similar to those restrictions in "how" it burdens the right. *Id.* (noting that "even when a law regulates arms-bearing for a permissible reason it may not be compatible with the

right if it does so to an extent beyond what was done at the founding" (citation modified)).

## 2. Discussion

We hold that the District's age-based firearm registration and licensing statutes are constitutional. Mr. Leyton argues that the District's firearm regulations are unconstitutional only as applied to people between the ages of eighteen and twenty-one. Neither he nor amicus Public Defender Service contend that the Second Amendment prohibits all age-based restrictions on the right to keep and bear arms. Put differently, there is no dispute that some age-based restrictions are consistent with this Nation's historical tradition of firearm regulation. We are deciding only the age at which the Second Amendment renders a restriction unconstitutional.

We assume without deciding that eighteen-to-twenty-one-year-olds with no criminal history are part of "the people" that the Second Amendment protects. We nonetheless conclude that the challenged regulations are consistent with our Nation's historical tradition of firearm regulation. We find persuasive recent decisions by two federal circuit courts of appeals—*National Rifle Association v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) (en banc), *pet. for cert. filed*, 2025 WL 1458530 (U.S. May 16, 2025) (No. 24-1185) (holding that a Florida law prohibiting the purchase of firearms by those under twenty-one is constitutional as applied to people between

the ages of eighteen and twenty-one because the law is consistent with our historical tradition of firearm regulation), and *McCoy v. ATF*, 140 F.4th 568 (4th Cir. 2025), *pet. for cert. filed*, 2025 WL 1908029 (U.S. July 3, 2025) (No. 25-24) (holding that a federal regulation prohibiting the commercial sale of handguns to individuals under the age of twenty-one is constitutional because from "English common law to America's founding and beyond, our regulatory tradition has permitted restrictions on the sale of firearms to individuals under the age of twenty-one"). *See also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 119-24 (10th Cir. 2024) (concluding that the trial court erred in preliminarily enjoining a Colorado law establishing twenty-one as the minimum age for the sale and purchase of guns because an age-based restriction on the commercial sale of firearms is presumptively lawful under *Heller* and the Colorado law does not employ "abusive ends" in ensuring that guns "are held by law-abiding, responsible persons"); *id.* at 124 ("[A] considerable portion of our country has made the normative judgment that setting a minimum purchase age at [twenty-one] is appropriate to ensure that firearms are held by responsible, law-abiding persons, in accordance with the Second Amendment."). *But see Reese v. ATF*, 127 F.4th 583, 600 (5th Cir. 2025) (reaching the opposite conclusion).

The en banc Eleventh Circuit set forth a comprehensive historical analysis in *Bondi*. We adopt that analysis in relevant part as follows. At the Founding, "a

person was an infant or a minor in the eyes of the law until age [twenty-one]." *Bondi*, 133 F.4th at 1117 (citation modified). "The Founders' generation shared the view that minors," i.e., anyone under the age of twenty-one, "lacked the reason and judgment necessary to be trusted with legal rights." *Id.* Concerns included their want for maturity, prudence, and discretion. *Id.* Due to their "lack of reason, infants were subject to the power of their parents until they reached age [twenty-one]." *Id.* (citation modified). Accordingly, "dependent minors lacked the formal capacity to participate in public life and were subject to the authority of household heads." *Id.* at 1118 (citation modified).

"Among the many legal disabilities that secured minors from hurting themselves by their own improvident acts, minors generally lacked the capacity to contract and to purchase goods on account." *Id.* at 1118 (citation modified). Aside from a few exceptions for necessities such as food and clothing, all "contracts with infants were either void or voidable" because "infants were supposed to want judgment and discretion in their contracts and transactions with others." *Id.* (citation modified). "By the early nineteenth century, voidability was applied so broadly that

it became *almost impossible* for children to form *any* contracts." *Id.* (citation modified).

This "inability to contract impeded minors from acquiring firearms during the Founding era." *Id.* "Minors also lacked disposable income to otherwise purchase firearms because they either worked for their parents for no wages . . . or any wages earned belonged to their parents." *Id.*

The court drew "two lessons from the legal treatment of minors at the Founding." *Id.* First, "minors generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor." *Id.* Second, "minors were subject to the power of their parents and depended on their parents' consent to exercise rights and deal with others in society." *Id.*

The court observed that state militia laws from the Founding era "confirm[ed] this understanding." *Id.* at 1119. "Because of the legal incapacity of individuals under the age of [twenty-one], states enacted laws at the Founding to address minors' inability to purchase firearms required for their militia service." *Id.* Some states exempted those under twenty-one from having to comply with the firearm requirement for militia service. *Id.* Other states explicitly required parents of individuals under twenty-one to acquire firearms for their children's militia service.

*Id.* And other states "implicitly required parents to supply minors with firearms because those states held parents liable for minors' fines related to militia service, including the failure to obtain a firearm." *Id.* Moreover, during the Founding era, "minors generally lacked unrestricted access to firearms." *Id.* at 1120. By 1826, at least twenty-one of the twenty-four states admitted to the Union "had enacted laws that placed the onus on parents to provide minors with firearms for militia service." *Id.* These laws, the court observed, reflected that, "at common law, minors could not purchase weapons for themselves." *Id.*[2]

"Mid-to-late-nineteenth-century laws consistent with these principles," the court explained, "further establish that our law historically precluded the purchase of firearms by individuals under the age of [twenty-one]." *Id.* at 1121. "In the second half of the nineteenth century, [twenty] jurisdictions enacted laws that restricted access to arms for minors." *Id.* "Most of those laws prohibited all methods

---

[2] The court also noted that Founding era university regulations "confirm[ed] that minors needed parental consent to access firearms." *Id*. Exercising parental authority through the doctrine of in loco parentis, universities "commonly restricted firearm access both on and off campus." *Id.*

of providing arms to individuals under the age of [twenty-one]. And only a few of these laws allowed parents to provide arms to their children." *Id.*

"When the common-law regime became less effective at restricting minors' access to firearms, statutes increasingly did the work." *Id.* at 1122. Accordingly. "the law of the Founding era, which restricted the purchase of firearms by minors, continued into the nineteenth century in the form of statutory prohibitions." *Id.* "By the end of the nineteenth century, at least [nineteen] states and the District of Columbia—representing roughly [fifty-five] percent of the population of states admitted to the Union—restricted the purchase or use of certain firearms by minors." *Id.* (citation modified). These mid-to-late-nineteenth-century laws carried criminal penalties, from fines to imprisonment. *Id.*

"The age of the majority remained unchanged in the United States from the country's founding well into the twentieth century." *Id.* (citation modified); *see Rocky Mountain Gun Owners*, 121 F.4th at 124 ("The age of majority, as set by most states, remained at [twenty-one] well into the [twentieth] century."). States eventually lowered the age of majority to eighteen years in keeping with lowering the age of conscription during World War II. *Bondi*, 133 F.4th at 1122. Then the 1971 ratification of the Twenty-Sixth Amendment guaranteed the right to vote to individuals at the age of eighteen. *Id.* "But for much of the first two centuries of

our nation, our law limited the rights of individuals under the age of [twenty-one], including their purchase of firearms." *Id.* Moreover, a state lowering "the age of majority for some rights does not mean that it has less power to restrict the rights of minors than it did at the Founding." *Id.* at 1125; *see Rocky Mountain Gun Owners*, 121 F.4th at 126 ("[T]he minimum age for firearm purchases need not rise or fall entirely with the age at which most states currently set as the age of majority."). The Second Amendment does not turn "on an evolving standard of adulthood that is divorced from the text of the Amendment and from our regulatory tradition." *Bondi*, 133 F.4th at 1125. Ultimately, the court concluded that "[f]rom this history emerges a straightforward conclusion: the Florida law is consistent with our regulatory tradition in why and how it burdens the right of minors to keep and bear arms." *Id.* at 1122.

The Fourth Circuit in *McCoy* and the Tenth Circuit in *Rocky Mountain Gun Owners* reached similar conclusions based on similarly persuasive reasoning. *See McCoy*, 140 F.4th at 572 ("From English common law to America's founding and beyond, our regulatory tradition has permitted restrictions on the sale of firearms to individuals under the age of [twenty-one]."); *Rocky Mountain Gun Owners*, 121 F.4th at 123-27 (noting that it "seems evident that the necessity of *some* minimum age requirement is widely accepted—after all, no one is reasonably arguing that [eight]-year-olds should be allowed to purchase guns," and explaining why setting a

minimum purchase age at twenty-one is appropriate to ensure that firearms are held by responsible, law-abiding persons, in accordance with the Second Amendment).

For the same reasons, we see no constitutional infirmities with the District's age-based firearm registration and licensing statutes. History reveals a regulatory tradition of restricting access to firearms based on age for those considered to lack the judgment and discretion to use them safely. *Bondi* involved restrictions on the ability of eighteen-to-twenty-one-year-olds to purchase firearms and therefore relied in part on common-law limitations on the right of those under twenty-one to contract. 113 F.4th at 1118-20. "But the right to keep and bear arms surely implies the right to purchase them." *Reese*, 127 F.4th at 590 (citation modified). Accordingly, a restriction on the ability of those under twenty-one to purchase firearms necessarily implicates their ability to possess and carry them. The historical tradition of restricting the purchase of firearms by individuals under twenty-one is therefore a historical analogue relevantly similar to laws regulating the ability of those under twenty-one to possess or carry firearms. Because regulations preventing those under twenty-one from purchasing firearms are constitutional, so too are restrictions preventing those under twenty-one from possessing and carrying them.

While age-based firearm statutes became more common during the nineteenth century, the absence of Founding-era firearm-specific statutes is not dispositive.

Invocation of the absence of specific legislation as support for the existence of a right "assumes that founding-era legislatures maximally exercised their power to regulate." *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring). The Second Amendment does not demand such a "'use it or lose it' view of legislative authority." *Id.* at 740. Indeed, "the common law's general, far-reaching restrictions on minors' purchasing power made it unnecessary for Founding-era legislatures to more pointedly prohibit minors from buying firearms, in particular." *Bondi*, 133 F.4th at 1159 (Newsom, J., concurring). But "when those common-law restrictions waned in the nineteenth century, the states filled the void by enacting a flurry of outright bans, thereby . . . making explicit what was implicit at the Founding: laws may regulate the purchase of firearms by minors." *Id.* (citation modified). We need not and do not decide in this appeal how to address a conflict between the Founding-era and Reconstruction-era understandings of the right to keep and bear arms because the law of both eras restricted firearm possession by individuals under twenty-one.

The District's firearm laws are consistent with our regulatory tradition in why and how they burden the right of those under twenty-one to keep and bear arms. With respect to the "why," the District's regulations address the same problems as historical age-based restrictions on firearm access: preventing those deemed to lack reason, maturity, and judgment from obtaining firearms. *See Bondi*, 133 F.4th at 1122-23 (noting that the rationale of Florida's law, like Founding era law, is

motivated in part by concerns that "individuals under the age of [twenty-one] have not reached the age of reason and lack the judgment and discretion to purchase firearms responsibly"); *see also McCoy*, 140 F.4th at 577 (observing that federal firearm regulation and historical infancy doctrine "share[d] a common rationale" in that they were both "motivated by a recognition that individuals under the age of [twenty-one] lack good judgment and reason"); *Rocky Mountain Gun Owners*, 121 F.4th at 126 ("[P]sychological studies provide that individuals in their late teens and early [twenties] are less mature than adults in several significant and relevant ways.").

The District's age-based regulations are thus consistent with the Founding-era common-law tradition of disarming "particular groups for public safety reasons." *National Rifle Ass'n of America, Inc. v. ATF*, 700 F.3d 185, 200 (5th Cir. 2012);[3] *see also Kanter v. Barr,* 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) (explaining that the Second Amendment permits the categorical disarmament of

---

[3] Certain groups, such as African and Indigenous Americans, were historically disarmed for odious reasons, and discrimination on this basis would no longer pass constitutional muster under the Equal Protection Clause. *See Rahimi*, 602 U.S. at 775-76 (Thomas, J., dissenting). The fact remains, however, that the historical record of prohibitions establishes a tradition of safety-related restrictions, and restricting gun ownership and other activities (such as alcohol consumption) by eighteen-to-twenty-one year olds does not violate the Equal Protection Clause.

individuals whose possession "would otherwise threaten public safety").[4] This shared "why" is a "strong indicator" that the District's firearm restrictions "fall within a permissible category of regulations." *Rahimi*, 602 U.S. at 692.

The District's age-based regulations are also similar to historical restrictions in "how" they burden the right of those under twenty-one to keep and bear arms. The laws prevent those under the age of twenty-one from possessing and carrying firearms. In this regard, the District's laws regulate arms-bearing conduct in no more restrictive a manner as Founding era laws that limited access to firearms by those under twenty-one. *See Bondi*, 133 F.4th at 1118 (noting that at the Founding, "it became *almost impossible* for children to form *any* contracts," including those for the purchase of firearms by people under the age of twenty-one); *see also McCoy*, 140 F.4th at 572 (noting that both the infancy doctrine and the federal firearm regulation "ma[d]e it exceedingly difficult for a minor to purchase a handgun from a commercial seller, and they d[id] so in similar ways").

---

[4] With respect to public safety, we note that in a different context the D.C. Council has made a reasonable judgment that the "hallmark features" of people under twenty-five years old include "immaturity, impetuosity, and failure to appreciate risks and consequences" (Incarceration Reduction Amendment Act, D.C. Code § 24-403.03(c)(10)), and the District cites statistics that in 2019, eighteen-to-twenty-year-olds accounted for over fifteen percent of arrests for homicide and manslaughter even though they comprise less than four percent of the nation's population.

District law is therefore "consistent with the principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 691-92, and is "analogous enough" to historical restrictions "to pass constitutional muster," *Bruen*, 597 U.S. at 30; *see also id.* at 73 (Alito, J., concurring) (noting that the *Bruen* decision "d[id] not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of [eighteen] . . . and bars the sale of a handgun to anyone under the age of [twenty-one]"). We are therefore satisfied that the government has carried its burden of showing that there is a historical tradition that permits limiting firearm registration and licenses to people who are at least twenty-one years old and that District law "fits comfortably within this tradition." *Rahimi*, 602 U.S. at 690. Accordingly, we hold that the District's age-based firearm registration and licensing statutes are constitutional because they are consistent with our Nation's historical tradition of firearm regulation.

## B. Prosecutor's Statements

### 1. Standard of Review

We review a claim of prosecutorial misconduct for abuse of discretion. *Teoume-Lessane v. United States*, 931 A.2d 478, 494-95 (D.C. 2007). "When evaluating claims of prosecutorial error, we must first determine whether the

challenged statements from the prosecutor, viewed in context, were, in fact, improper." *Bost v. United States*, 178 A.3d 1156, 1190 (D.C. 2018).[5]

## 2.    Discussion

In *Griffin v. California*, 380 U.S. 609, 615 (1965), the Supreme Court held that the right against self-incrimination found in the Fifth Amendment to the U.S. Constitution forbids the government from arguing or making adverse inferences that a defendant's decision *not* to testify was evidence of guilt. This court took this principle a step further in *Jenkins v. United States*, 374 A.2d 581 (D.C. 1977). Relying on *Griffin*, we held that the government could not argue that a defendant's ability to be present during the trial allowed him to listen to the evidence and tailor his testimony accordingly. *Jenkins*, 374 A.2d at 584. We reasoned that such an argument interfered with the defendant's Sixth Amendment constitutional right to confront the witnesses against him. *Id.* The *Jenkins* panel, therefore, took *Griffin*, a Fifth Amendment case, and extended its reasoning to the Sixth Amendment context. When confronted with the question of whether *Griffin* extends to cases in which the defendant does testify, however, the Supreme Court disagreed. In those

---

[5] While it is unclear whether Mr. Leyton preserved his claim of prosecutorial error, the government "waived the waiver" by not arguing forfeiture on appeal. *Walker v. United States*, 201 A.3d 586, 594 (D.C. 2019). We thus assume without deciding that Mr. Leyton's claim is preserved.

circumstances, the Court held that the government is permitted to make arguments about a defendant "tailoring" his testimony after seeing the government's evidence. *Portuondo v. Agard*, 529 U.S. 61, 70 (2000).

This court subsequently had to decide whether to uphold *Jenkins* or change course in light of the Supreme Court's decision in *Portuondo*. In *Teoume-Lessane*, 931 A.2d at 494, we adopted the reasoning of the Supreme Court in *Portuondo* and overruled *Jenkins*. We held that "the prosecutor did not impermissibly comment upon the effect of the defendant's presence at trial on his credibility as a witness, and that the trial court did not abuse its discretion in permitting the jury to consider the remarks." *Id.* at 495.

In so doing, a division of this court overruled a prior division's decision in *Jenkins* in light of *Portuondo*. *Id.* at 494-95 (concluding that "*Jenkins*, in its reliance on *Griffin*, was a constitutional decision that has now been overruled by the United States Supreme Court in *Portuondo* and therefore is no longer binding on this court"). The *Teoume-Lessane* panel noted the significant nature of its action, explaining that "a division of this court may not overrule the prior decision of another" but a panel also "cannot blindly follow a prior ruling in the face of clearly controlling doctrine later enunciated by the Supreme Court; a panel decision interpreting the Constitution would undoubtedly yield to a later Supreme Court

decision on point." *Id.* at 494 (citation modified). *Teoume-Lessane* therefore controls the issue whether the government acts improperly by commenting on a defendant's presence at trial and how his presence affects the credibility of his testimony.

Mr. Leyton asserts that *Jenkins* was not in fact a constitutional decision overruled by *Portuondo* and therefore we should apply *Jenkins*, not *Teoume-Lessane*, to his claim. We expressly held in *Teoume-Lessane*, however, that *Jenkins* was a constitutional decision, *id.* at 494, and, even assuming (without suggesting) that that conclusion is subject to debate, as a division of this court we are bound by *Teoume-Lessane. M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

Applying *Teoume-Lessane*, we conclude that the government's argument that Mr. Leyton changed his defense theory only after hearing the government's evidence was not improper. While Mr. Leyton characterizes the government as having commented on his pretrial "silence," the government in fact highlighted the conflict between Mr. Leyton's statements to police on the night of the shooting (that he was not the shooter) and his in-court testimony (that he shot Mr. Hernandez in self-defense). This argument was consistent with the government's right to impeach a defendant's credibility as a witness when the defendant testifies at trial. *See Portuondo*, 529 U.S. at 69 ("The prosecutor's comments in this case concerned

respondent's credibility as a witness, and were therefore in accord with our longstanding rule that when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness." (citation modified)). The trial court therefore did not err in allowing the jury to hear the prosecutor's arguments.

## III. Conclusion

For the foregoing reasons, we affirm Mr. Leyton's convictions and remand for the limited purpose of merging Mr. Leyton's convictions and resentencing as necessary.

*So ordered.*